Lawrence S. Lustberg
John D. Haggerty
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
llustberg@gibbonslaw.com
jhaggerty@gibbonslaw.com

David S. Blatt (*pro hac vice* to be filed)
Rachel Rodman (*pro hac vice* to be filed)
Benjamin E. Moskowitz (*pro hac vice* to be filed)
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
dblatt@wc.com
rrodman@wc.com
bmoskowitz@wc.com

*Attorneys for Plaintiff*
*New Jersey Bankers Association*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY BANKERS ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> GURBIR GREWAL, in his official capacity as Attorney General of the State of New Jersey, <br><br> Defendant. | Civil Action No. 18-15725 <br><br> *Document electronically filed* <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiff New Jersey Bankers Association brings this action for declaratory and injunctive relief under 42 U.S.C. § 1983 against Defendant Gurbir Grewal, in his official capacity as Attorney General of the State of New Jersey, because the State of New Jersey

continues to enforce an antiquated campaign finance law that clearly violates the First Amendment rights of Plaintiff and its members.

2.      Like many other states, New Jersey imposes limits on the amount of money that individuals may contribute to political candidates and party committees.  As a general matter, New Jersey allows corporations, labor organizations, associations, and groups to contribute to political candidates and party committees, subject to the same limits as individuals. *See* N.J.A.C. 19:25–1.7; *id.* at 19:25–11.2.

3.      This case involves a challenge to a statutory prohibition unique to New Jersey—specifically, New Jersey's 100-year-old ban on banks making contributions or expenditures, of any kind and in any amount, to or in support of political parties or candidates for any state or local office.  *See* N.J.S.A. 19:34–45.

4.      With certain limited exceptions, *see* N.J.S.A. 19:34–32; N.J.S.A. 19:34–45; N.J.S.A. 5:12–138, non-bank corporations in New Jersey are not subject to any such prohibition.

5.      New Jersey's restraint on banks' political expression and association does not support an important state interest.  The United States Supreme Court has held as a matter of law that independent expenditures, regardless of source, do not corrupt or give rise to the appearance of corruption.  *See Citizens United v. FEC*, 558 U.S. 310, 357–58 (2010).  Nor can New Jersey demonstrate that prohibiting contributions by banks furthers any interest in combatting *quid pro quo* corruption or the appearance of such corruption.

6.      New Jersey's ban on contributions by banks also is not closely drawn:  it completely prohibits, rather than limits, contributions; it prohibits contributions to candidates for all state and local offices, regardless of their connection to the regulation of banks in New Jersey;

it applies even to banks that are not chartered by New Jersey and thus are not subject to New Jersey's regulation of banks; and it leaves banks without alternative channels to express support for or associate with candidates for state or local office, including by prohibiting banks from spending money to administer or support political action committees established by their employees.

7.     New Jersey's ban on contributions and expenditures by banks thus violates the First Amendment to the United States Constitution.  As set forth below, this Court should declare the prohibitions imposed on banks by N.J.S.A. 19:34–45 unlawful and enjoin its application.  New Jersey Bankers Association should be subject to the same limitations on political contributions as other corporations in the State.

## THE PARTIES

8.     Plaintiff New Jersey Bankers Association is a trade association, incorporated pursuant to N.J.S.A. 15A:2–1 *et seq.*, representing 88 banking institutions headquartered or having offices in New Jersey.  Plaintiff's members include national banks and banks chartered by the States of New Jersey, New York, and Pennsylvania.  For more than 113 years, Plaintiff has been an advocate for the New Jersey banking industry.  Plaintiff's primary mission is to represent its members' interests before state and federal government authorities. Plaintiff's principal place of business is 411 North Avenue East, Cranford, New Jersey 07016.

9.     Plaintiff wishes to contribute to political campaigns for state and local office and to political parties in New Jersey.  Plaintiff also wishes to make independent expenditures in support of candidates for state and local office, including by advertising in media outlets and mailing political materials to New Jersey voters, as well as contributing to independent-expenditure-only committees in connection with state and local elections.  Were it not for New Jersey's prohibition on contributions and expenditures by banks, Plaintiff would be

eligible to engage in all of these activities.  *See* Letter from David Samson, N.J. Atty. Gen., to Frederick M. Herrman, Exec. Dir., Election Law Enforcement Comm'n (Mar. 14, 2002) ("Whether the New Jersey Credit Union League may make political contributions") (interpreting N.J.S.A. 19:34–45 to prohibit contributions by credit-union trade association).

10.     Defendant Gurbir Grewal is the Attorney General of the State of New Jersey.  His official address is the Office of the Attorney General, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, New Jersey 08625.  Attorney General Grewal is being sued in his official capacity for declaratory and injunctive relief.  In his capacity as Attorney General, he is responsible for enforcing N.J.S.A. 19:34–45, which subjects banks to criminal penalties for spending money or contributing anything of value to any political party, candidate, or campaign committee.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Plaintiff alleges a violation of the First Amendment to the United States Constitution. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), because Plaintiff is seeking to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

12.     This Court has personal jurisdiction over Defendant, who is being sued in his official capacity, because he performs his official duties in this District and has his office in Trenton, New Jersey.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because Defendant, who is being sued in his official capacity, performs his official duties in this District, and because a substantial part of the events giving rise to this action occurred in this District.

14.     This Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## BACKGROUND

### A.     New Jersey's Contribution and Expenditure Ban

15.     New Jersey prohibits banks and certain other corporations from making political contributions and expenditures.  N.J.S.A. 19:34–45 states in full:

> No corporation carrying on the business of a bank, savings bank, co-operative bank, trust, trustee, savings indemnity, safe deposit, insurance, railroad, street railway, telephone, telegraph, gas, electric light, heat or power, canal or aqueduct company, or having the right to condemn land, or to exercise franchises in public ways granted by the state or any county or municipality, and no corporation, person, trustee or trustees, owning or holding the majority of stock in any such corporation, shall pay or contribute money or thing of value in order to aid or promote the nomination or election of any person, or in order to aid or promote the interests, success or defeat of any political party.

16.     On its face, this statute broadly prohibits both political contributions and expenditures by banks, including independent expenditures.  Any expenditure of corporate funds by a bank to support the election or defeat of a candidate, or "the interests, success or defeat of any political party," N.J.S.A. 19:34–45, whether or not coordinated with a candidate or campaign, would run afoul of the requirement that a bank not pay money or "thing of value," *id.*, for the purpose of aiding, promoting, or defeating a candidate for state or local office.  So too would any contribution to a political committee that makes only independent expenditures.

17.     The statute also prohibits contributions and expenditures by any corporation or person holding the majority of stock in a bank.  *See* N.J.S.A. 19:34–45.  The New Jersey Attorney General has interpreted that provision to cover subsidiaries, parent companies, and affiliates, *see* Letter from David Samson, N.J. Atty. Gen., to Frederick M. Herrman, Exec. Dir., Election Law Enforcement Comm'n (Mar. 14, 2002) ("Whether the Hertz Corporation may

Make Political Contributions"), as well as industry trade groups whose memberships are comprised of banks, *see* Letter from David Samson, N.J. Atty. Gen., to Frederick M. Herrman, Exec. Dir., Election Law Enforcement Comm'n (Mar. 14, 2002) ("Whether the New Jersey Credit Union League may make political contributions").

18.     In contrast to federal law, *see* 52 U.S.C. § 30118(b)(2) (allowing corporate funds to be spent to establish, administer, and solicit contributions for political action committees), New Jersey's statute further prohibits banks from using any corporate funds to establish, administer, or solicit contributions for a political action committee established by their employees, *see* 1979 N.J. Op. Atty. Gen. 76 (reasoning that the absence of a similar provision in N.J.S.A. 19:34–45 implies that banks may not expend resources on political action committees).

19.     Violations of Title 19 of the New Jersey Code, in which this ban on contributions and expenditures by banks is codified, are punishable as third degree crimes. N.J.S.A. 19:34–1; *State v. Bank of N.J.*, 354 A.2d 693, 696 (N.J. Super. Ct. Law Div. 1976).

### B.     Historical Context of the Ban

20.     New Jersey originally enacted its ban on contributions and expenditures by banks in 1911 as part of the Corrupt Practice Act, described at the time as "one of the most stringent laws in any state in the country." *Another Jersey Reform: Corrupt Practice Measure Is Signed by the Governor*, N.Y. Daily Trib., Apr. 21, 1911, at 4.  The legislative history does not shed light on the rationale for the ban on banks' political speech, but the New Jersey Attorney General, noting the statute's close proximity in time to the federal Corrupt Practices Act of 1907, has offered that "it is reasonable to assume that the New Jersey Legislature operated under the same objectives as did Congress."  1979 N.J. Op. Atty. Gen. 76.

21.     In enacting the federal Corrupt Practices Act, Congress sought to combat the influence that corporations might exert over elected officials based on their ability to make large political contributions.  According to the New Jersey Attorney General, "[t]he primary congressional concern underlying the enactment of that statute was the growing use of aggregated corporate wealth to control the election process and to influence elective officials to act in a manner favoring corporate interests over those of the general public."  1983 N.J. Op. Atty. Gen. 271.  Therefore, the Attorney General reasoned, N.J.S.A. 19:34–45 "was intended to address the same evil, corporate influence over government officials."  *Id.*

22.     In addition to banning banks' contributions and expenditures, N.J.S.A. 19:34–45 also prohibits contributions and expenditures by any insurance, railroad, street railway, telephone, telegraph, gas, electric light, heat or power, and canal or aqueduct company, as well as any company that has the right to condemn land or to exercise franchises in public ways granted by the State or any county or municipality.  A ban on these industries' political speech targeted the biggest corporations at the time the statute was enacted in 1911, where wealth was most heavily aggregated.

23.     New Jersey has not subjected any other industries to the prohibitions of N.J.S.A. 19:34–45 since the statute's enactment.  The only substantive change to the statute occurred in 2001, when the New Jersey legislature amended N.J.S.A. 19:34–45 to clarify that it did not apply to electrical co-generation facilities or to retail sellers that extend credit.  *See* P.L.2001, c. 384, § 1.

24.     New Jersey appears to be unique in singling out political activity by banks.  Plaintiff is aware of no other state that currently allows corporations to make

contributions as a general matter but completely bans banks from making contributions or expenditures.

### C.    Recent Developments in Campaign Finance Law

25.    The freedom to make political contributions and expenditures is a right protected from government interference under the First Amendment to the United States Constitution.  *See McCutcheon v. FEC*, 572 U.S. 185, 203 (2014).  The United States Supreme Court has held for over 40 years that restrictions on contributions are permissible only if they [1] further "a sufficiently important interest and [2] employ[] means closely drawn to avoid unnecessary abridgement" of the contributor's "associational freedoms."  *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam).  The Supreme Court has applied an even higher standard to restrictions on expenditures, which must be narrowly tailored to serve a compelling state interest. *McCutcheon*, 572 U.S. at 197 (explaining that under *Buckley*, "the Government may regulate [political expenditures] only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest").

26.    For years, the Supreme Court accepted certain government interests as sufficient to sustain restrictions on both contributions and expenditures.  For example, in *Austin v. Michigan Chamber of Commerce*, the Court explained that states had an interest in preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas."  494 U.S. 652, 660 (1990).  This interest was known as the "antidistortion interest."  *Citizens United*, 558 U.S. at 348.  And in *FEC v. Beaumont*, the Court observed that restrictions on corporations' political speech may serve an interest in protecting dissenting shareholders from being compelled to fund corporate political speech with which they

disagree.  539 U.S. 146, 154–55 (2003).  This interest was known as the "shareholder-protection interest."  *Citizens United*, 558 U.S. at 349.  Finally, in the seminal case of *Buckley v. Valeo*, the Supreme Court upheld generally applicable limits on political contributions on the ground that those contributions could and had been used "to secure . . . political *quid pro quo*[s]" from elected officials.  424 U.S. at 26–27 (citing "deeply disturbing examples [of *quid pro quo* corruption] surfacing after the 1972 election [that] demonstrate that the problem is not an illusory one").  This interest was known as the "anticorruption interest."  *Citizens United*, 558 at U.S. 348.

27.     In 2010, the Supreme Court rejected both the antidistortion and shareholder-protection interests as permissible rationales for sustaining campaign finance restrictions.  In *Citizens United v. FEC*, the Supreme Court expressly overruled *Austin v. Michigan Chamber of Commerce*, *see Citizens United*, 558 U.S. at 365, dismissing the notion that the government can legislate to equalize the relative influence of individuals and groups in the political marketplace, *see id.* at 350.  The Supreme Court also rejected the shareholder-protection interest, explaining that such an interest would justify intolerable government suppression of speech, *see id.* at 361–62.

28.     The Supreme Court left in place the anticorruption interest.  It clarified, however, that the government has an interest only in preventing *quid pro quo* corruption and its appearance.  As the Court explained, "[i]ngratiation and access . . . are not corruption."  *Id.* at 360.  Neither are "'generic favoritism or influence,'" *id.* at 359 (quoting *McConnnell v. FEC*, 540 U.S. 93, 296 (2003) (Kennedy, J., concurring in the judgment in part)).

29.     In 2014, the Supreme Court built on these principles in *McCutcheon v. FEC*, explaining that *quid pro quo* corruption refers to "a direct exchange of an official act for

money."  572 U.S. at 192.  "Campaign finance restrictions that pursue other objectives," the

Court observed, "impermissibly inject the Government" into the marketplace of political ideas.

*Id.*  A state may not, for instance, "regulate contributions simply to reduce the amount of money

in politics, or to restrict the political participation of some in order to enhance the relative

influence of others."  *Id.* at 191.  Unless a state law or regulation "target[s] what [the Court has]

called '*quid pro quo*' corruption or its appearance," it will not withstand constitutional scrutiny.

*Id.* at 192.

## BASIS FOR RELIEF

A.   **New Jersey's ban on independent expenditures by banks is unconstitutional under Supreme Court precedent.**

30.     N.J.S.A. 19:34–45 prohibits banks from spending any money or thing of

value to aid or promote a political candidate or party.  By its terms, that prohibition encompasses

independent expenditures, which are defined as "political speech presented to the electorate that

is not coordinated with a candidate."  *Citizens United*, 558 U.S. at 360.

31.     In *Citizens United*, the Supreme Court held that "independent

expenditures, including those made by corporations, do not give rise to corruption or the

appearance of corruption."  558 U.S. at 357.  For that reason, the Court struck down a federal

ban on independent expenditures by corporations.  *See id.* at 365.  Under *Citizens United* then, a

ban on independent expenditures, including by corporate entities, is unconstitutional.

32.     The Supreme Court reaffirmed this understanding two years later in

*American Tradition Partnership v. Bullock*, 567 U.S. 516 (2012) (per curiam), where it evaluated

the constitutionality of a Montana law providing that a "corporation may not make . . . an

expenditure in connection with a candidate or a political committee that supports or opposes a

candidate or a political party."  Mont. Code Ann. § 13–35–227(1) (2011).  The Court considered

"whether the holding of *Citizens United* applies to the Montana state law," and concluded that "[t]here can be no serious doubt that it does." *Am. Tradition P'Ship*, 567 U.S. at 516.  In doing so, the Court reaffirmed its "holding that 'political speech does not lose First Amendment protection simply because its source is a corporation.'" *Id.* (quoting *Citizens United*, 558 U.S. at 342).

33.     New Jersey's restriction on expenditures by banks is materially indistinguishable from the Montana law that the Supreme Court struck down in *American Tradition Partnership*.  *Compare* N.J.S.A. 19:34–45 ("No corporation carrying on the business of a bank . . . shall pay . . . money or [any] thing of value in order to aid or promote the nomination or election of any person, or in order to aid or promote the interests, success or defeat of any political party."), *with* Mont. Code Ann. § 13–35–227(1) (2011) (a "corporation may not make . . . an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party").

34.     Because a ban on independent expenditures is unconstitutional, regardless of the source of the expenditures, New Jersey's prohibition on independent expenditures by banks is unconstitutional and may not be enforced against Plaintiff or its members.

**B.      New Jersey's ban on political contributions by banks is unconstitutional because it does not further a sufficiently important state interest, and because it is not closely drawn to avoid unnecessary infringement of associational freedoms.**

35.     The ban on banks' political contributions set forth in N.J.S.A. 19:34–45 may be upheld only if it furthers a sufficiently important state interest.  Following the Supreme Court's 2010 decision in *Citizens United* and 2014 decision in *McCutcheon*, the only legitimate interest that New Jersey may invoke here is combatting *quid pro quo* corruption or its appearance.  This is the State's burden.  *See McCutcheon*, 572 U.S. at 210.  "A state must do

more than merely recite a general interest in preventing corruption.  What *Buckley* requires is a

demonstration, not a recitation."  *Lavin v. Husted*, 689 F.3d 543, 547 (6th Cir. 2012).  A ban on

banks' political contributions cannot withstand scrutiny without actual "evidence" that it

"prevents actual or perceived corruption" by banks.  *Id.*

       36.     New Jersey cannot possibly satisfy this burden.  To begin with, the history

of N.J.S.A. 19:34–45 shows that New Jersey's ban on political contributions by banks was

enacted not to combat actual "this for that" corruption or its appearance but, in the opinion of

New Jersey's Attorney General, to limit the effects of large aggregations of wealth by

corporations and to reduce the ability of targeted corporations to influence, gain access to, or

earn the gratitude of elected officials.  *See* 1983 N.J. Op. Atty. Gen. 271.  Indeed, the New Jersey

Attorney General has invoked these interests repeatedly whenever he or she has been asked to

interpret the ban.  *See, e.g.*, 1979 N.J. Op. Atty. Gen. 76 (observing that 1907 federal law that

inspired New Jersey's 1911 Corrupt Practices Act was enacted "to destroy the influence over

elections exercised by holders of large aggregates of capital"); 1997 N.J. Op. Atty. Gen. 93

(describing state ban on banks' political contributions as "intended to address . . . corporate

influence over government officials"); 2003 N.J. Op. Atty. Gen. 30 (explaining that state ban on

banks' political contributions "furthers the important government interest of insuring that

organizations which amass great wealth in the economic marketplace do not gain an unfair

advantage in the political marketplace" (internal quote marks, alternation, and citation omitted)).

       37.     However, the State's interest in limiting the effects of aggregations of

wealth is no longer a legitimate interest, as the Supreme Court held in *Citizens United*, 558 U.S.

at 365.  And the State's purported interest in limiting corruption is overgeneralized and

misconceives the relevant understanding of corruption, which excludes influence, access, and

ingratiation, *see id.* at 359–60, and instead includes only the exchange of an official act for money, *see McCutcheon*, 572 U.S. at 192.  Under modern Supreme Court precedent, the actual interests underlying N.J.S.A. 19:34–45 are simply no longer a permissible basis to restrict banks' political expression.

38.     Not only is the legislative record for N.J.S.A. 19:34–45 devoid of any hint of pay-to-play scandals unique to or even involving contributions by banks, but it is doubtful that New Jersey could have developed such a record even if it had tried.  In fact, when Congress enacted a ban on political contributions by all corporations in 1907, political contributions by banks were practically unheard of.  Notably, the federal Act's sponsor, Senator Benjamin Tillman, specifically inquired of the Treasury Department about whether national banks had contributed to political campaigns.  The response "was that as far as was known at the Treasury Department nothing of that sort had taken place."  40 Cong. Rec. S2642 (Feb. 19, 1906) (Statement of Sen. Tillman).

39.     Any claim that New Jersey's ban on banks' political contributions furthers the State's anticorruption interest is also belied by the fact that no other states currently have similarly stringent and targeted laws with respect to banks.  That other states do not have such uniquely restrictive laws "shows that the . . . statute" is an "outlier."  *Wagner v. FEC*, 793 F.3d 1, 16 (D.C. Cir. 2015) (en banc).  If New Jersey's approach to banning banks' political contributions truly furthered the aim of combatting *quid pro quo* corruption, it would be reasonable to expect that more states would have followed New Jersey's lead.  It is telling, and legally significant, that no state has done so, to the best of Plaintiff's knowledge.  *See id.* (noting relevance of other states' statutes).  And even within New Jersey, the importance of the State's purported anticorruption interest is undermined by the fact that it does not also prohibit political

contributions by non-bank financial institutions (for example, mortgage and installment lenders) that, just like banks, provide credit products to consumers and, just like banks, are regulated by the New Jersey Commissioner of Banking and Insurance.

40. Even if New Jersey somehow could establish that its ban on banks' political contributions furthered the State's interest in combatting *quid pro quo* corruption, the ban still must be closely drawn to support the State's interest without unnecessarily abridging associational freedoms. *See Buckley*, 424 U.S. at 25. The ban fails that test too, for multiple reasons.

41. *First*, N.J.S.A. 19:34–45 imposes a complete ban, rather than a limit, on contributions by banks. Courts routinely recognize that "an outright ban on contributions is a drastic measure." *Green Party of Conn. v. Garfield*, 616 F.3d 189, 206 (2d Cir. 2010); *Lavin*, 689 F.3d at 548 (same). Compared to a contribution limit, "a ban on contributions causes considerably more constitutional damage, as it wholly *extinguishes* that 'aspect of the contributor's freedom of political association.'" *Garfield*, 616 F.3d at 204 (quoting *Randall v. Sorrell*, 548 U.S. 230, 246 (2006)). By contrast, a limit "leaves intact the contributor's right to make 'the symbolic expression of support evidenced by a contribution.'" *Id.* (quoting *Randall*, 548 U.S. at 247).

42. Here, New Jersey cannot demonstrate why a limit on banks' contributions—which New Jersey already applies to individuals, labor unions, and other corporations, including corporations providing financial products—would not similarly further any interest the State may have.

43. *Second*, the ban applies to banks with no regulatory relationship to the State. In another indication of the ban's overbreadth, the ban applies to *any* corporation

"carrying on the business of a bank" in New Jersey.  But many banks operating in New Jersey, including many of Plaintiff's members, are national banks regulated by the federal government, or are banks chartered by a state other than New Jersey and regulated by that other state's bank regulatory authority.  For example, Plaintiff counts among its members Beneficial Bank, which is chartered in Pennsylvania and regulated by the Pennsylvania Department of Banking; Northfield Bank, which is chartered in New York and regulated by the New York State Banking Department; and Valley National Bank, which is regulated by the Office of the Comptroller of Currency.

44.     *Third*, New Jersey's ban on banks' contributions is overbroad because it applies to elections for offices that have nothing to do with regulation of the banking industry in New Jersey.  The New Jersey Department of Banking and Insurance is responsible for regulating banks chartered by the State.  That Department is run by a Commissioner nominated by the Governor and confirmed by the State Senate.  *See* N.J.S.A. 17:1–1 (creating New Jersey Department of Banking and Insurance); N.J.S.A. 17:1–2(a) (making clear that the Commissioner of Banking and Insurance is appointed by the Governor).  New Jersey-chartered banks, national banks, and banks chartered by other states also are subject to the same laws and regulations of general applicability as any other corporation doing business in New Jersey.  But in New Jersey, banks (regardless of charter and in contrast to other corporations doing business in the State) and their majority owners may not contribute to candidates not only for Governor and state senator, but also for state assemblyman, mayor, county freeholder board, school board, county sheriff, or fire district commissioner.  Thus, N.J.S.A. 19:34–45 prohibits banks and their majority owners from contributing to candidates when there is not even a conceivable "official act" that could be exchanged for a contribution.  *McCutcheon*, 572 U.S. at 192.

45.     Typically, broad-based bans on contributions to candidates for any office apply to contractors who do business directly with a state and where an extensive track record exists of pay-to-play scandals, *see, e.g.*, *Wagner*, 793 F.3d at 17, or to gambling interests, which courts have found are uniquely and inherently prone to corruption, *see, e.g.*, *In re Soto*, 565 A.2d 1088, 1104 (N.J. Super. Ct. App. Div. 1989) ("It has been legislatively and judicially recognized that crime and corruption are inherent in the casino industry and that casino gambling is unique."). These circumstances do not apply to banks operating in New Jersey.

46.     A comparison of the New Jersey statute with other states' statutes restricting contributions from regulated entities further demonstrates the pervasive and intolerable overbreadth of New Jersey's ban on banks' political contributions. In New Mexico, for example, regulated entities are prohibited from making contributions only to candidates for "a regulatory office" that "directly regulate[s]" them. N.M. Stat. Ann. § 1-19-34.2. Although Georgia prohibits electric membership organizations from contributing to any candidate, it, like New Mexico, bans regulated entities only from contributing to candidates for the office that regulates them. Ga. Code Ann. § 21-5-30.1(a)-(b). Similarly, the State of Washington prohibits insurers from contributing to candidates for that state's elected insurance commissioner, who directly regulates insurers. Wash. Rev. Code Ann. 48.30.110. And Alabama and Mississippi both prohibit heavily regulated utilities under the jurisdiction of the Public Service Commission from contributing to candidates for public service commissioner, an elected position. Ala. Code § 17-5-14(c); Miss. Code Ann. § 77-1-11. These statutes all address the potential for *quid pro quo* corruption or its appearance by banning contributions by directly regulated entities to their elected regulators. New Jersey's ban on political contributions by banks, which are not regulated

by any elected official, sweeps much more broadly by banning political contributions by banks to political parties and to *all* candidates for *any* elected state or local office.

47.     *Fourth*, banks lack alternative channels to speak and associate in the political marketplace in New Jersey.  Banks do not speak through political action committees ("PACs").  As the Supreme Court recently made clear, a "PAC is a separate association from the corporation," meaning the ability for corporations to have PACs "does not allow corporations to speak."  *Citizens United*, 558 U.S. at 337.  That bank employees may choose to form a PAC in no way alleviates the burden on speech imposed on banks themselves by N.J.S.A. 19:34–45.

48.     Moreover, even at the federal level, "PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations."  *Citizens United*, 558 U.S. at 337.  In New Jersey, the burden is even greater.  Whereas federal law allows corporate funds to be used to establish and administer a PAC and solicit contributions from employees, *see* 52 U.S.C. § 30118(b)(2), New Jersey law does not, *see* 1979 N.J. Op. Atty. Gen. 76.

49.     Finally, in contrast to individuals who might be prevented from making contributions under certain circumstances, banks do not have the alternative option to "volunteer for candidates, parties, or political committees; . . . speak in their favor; [or] host fundraisers and solicit contributions from others."  *Wagner*, 793 F.3d at 25.

                              *        *        *

50.     In sum, N.J.S.A. 19:34–45 prohibits political contributions and expenditures by banks, of any kind and in any amount; it targets an industry with no legislative record of political contribution scandals or other historical record demonstrating an inherent and unique susceptibility to *quid pro quo* corruption; it applies to entities without any regulatory nexus to New Jersey, aside from having to abide by the general laws and regulations that apply to and affect every business operating in the State; it applies to state and local offices that have

nothing to do with bank regulation; and it shuts down alternative avenues for banks to express support for and affiliate with candidates and their views.  New Jersey cannot articulate, let alone demonstrate, an anticorruption interest that justifies such a sweeping and drastic ban on protected political expression.

**Count 1**
**(Violation of the First Amendment to the United States Constitution by Banning Independent Expenditures)**

51.     Plaintiff incorporates each of the preceding paragraphs as if fully set forth herein.

52.     New Jersey prohibits corporations carrying on the business of a bank, savings bank, co-operative bank, trust, trustee, savings indemnity, or safe deposit from making independent expenditures aiding or promoting any state candidate or political party.

53.     That restriction on speech, codified in N.J.S.A. 19:34–45, may be sustained only if it is narrowly tailored to serve the compelling state interest in combatting *quid pro quo* corruption or its appearance.

54.     As a matter of law, bans on banks' independent expenditures do not serve the interest of combatting *quid pro quo* corruption or its appearance.

55.     Accordingly, New Jersey's ban on independent expenditures violates the rights of Plaintiff and its members under the First Amendment to the United States Constitution.

56.     Defendant, acting under color of state law, has deprived, and continues to deprive, Plaintiff and its members of their constitutional rights.

**Count 2**
**(Violation of the First Amendment to the United States Constitution by Banning Political Contributions)**

57.     Plaintiff incorporates each of the preceding paragraphs as if fully set forth herein.

58.     New Jersey prohibits corporations carrying on the business of a bank, savings bank, co-operative bank, trust, trustee, savings indemnity, or safe deposit from making any contributions that aid or promote any state candidate or political party.

59.     That restriction on speech, codified in N.J.S.A. 19:34–45, may be sustained only if it is closely drawn to serve the important state interest in combatting *quid pro quo* corruption or its appearance, without unnecessarily abridging associational freedoms.

60.     New Jersey's ban on banks' political contributions does not further the State's interest in combatting *quid pro quo* corruption or its appearance.

61.     New Jersey's ban on banks' political contributions is not closely drawn to achieve its ends without unnecessarily abridging the associational freedoms of Plaintiff and its members.

62.     Accordingly, New Jersey's ban on banks' political contributions violates the rights of Plaintiff and its members under the First Amendment to the United States Constitution.

63.     Defendant, acting under color of state law, has deprived, and continues to deprive, Plaintiff and its members of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(a)     A declaratory judgment that the ban on independent expenditures by banks, as well as contributions by banks to independent-expenditure-only committees, codified in N.J.S.A. 19:34–45, is unconstitutional;

(b)      An injunction prohibiting Defendant from enforcing the ban, codified in N.J.S.A. 19:34–45, on independent expenditures and contributions to independent-expenditure-only committees by banks;

(c)      A declaratory judgment that the ban on political contributions by banks, codified in N.J.S.A.19:34–45, is unconstitutional;

(d)      An injunction prohibiting Defendant from enforcing the ban, codified in N.J.S.A. 19:34–45, on political contributions by banks;

(e)      Reasonable attorney's fees and costs, pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 1988(b); and

(f)      Any such other and further relief as the Court may deem equitable and just.

Dated:  November 6, 2018      Respectfully submitted,

s/  Lawrence S. Lustberg
Lawrence S. Lustberg
John D. Haggerty
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
llustberg@gibbonslaw.com
jhaggerty@gibbonslaw.com

David S. Blatt (*pro hac vice* to be filed)
Rachel Rodman (*pro hac vice* to be filed)
Benjamin E. Moskowitz (*pro hac vice* to be filed)
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
dblatt@wc.com
rrodman@wc.com
bmoskowitz@wc.com

*Attorneys for Plaintiff*
*New Jersey Bankers Association*