**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY BANKERS ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>GURBIR GREWAL, in his official capacity as Attorney General of the State of New Jersey,<br><br>Defendant. | Case No. 3:18-cv-15725 (BRM) (DEA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion for Summary Judgment (ECF No. 81) filed by Defendant Gurbir Grewal ("Grewal"), as the Attorney General of New Jersey, and a Cross Motion for Summary Judgment (ECF No. 82) filed by Plaintiff New Jersey Bankers Association ("NJBA"). Grewal filed a Reply. (ECF No. 83.) Campaign Legal Center ("CLC") filed an Amicus Brief. (ECF No. 91.) NJBA filed a Reply. (ECF No. 92.) Having reviewed the submissions filed in connection with the motions and having held oral argument pursuant to Federal Rule of Civil Procedure 78(a), for the reasons set forth below and for good cause appearing, Grewal's Motion for Summary Judgment is **GRANTED in part and DENIED in part**, and NJBA's Cross Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## I.    BACKGROUND

NJBA is a trade association representing 88 banking institutions headquartered or having offices in New Jersey. (ECF No. 1 ¶ 8.) NJBA intends to contribute to political campaigns for state and local office and to political parties in New Jersey. (*Id.* ¶ 9.) NJBA also intends to make

independent expenditures[1] in support of candidates for state and local office, including by advertising in media outlets and mailing political materials to New Jersey voters, as well as contributing to independent-expenditure-only committees in connection with state and local elections. (*Id*.) NJBA claims, were it not for New Jersey's prohibition on contributions and expenditures by banks (codified in N.J. Stat. Ann. § 19:34-45), NJBA would be eligible to engage in all of these activities. (*Id*.)

On November 6, 2018, NJBA filed a Complaint against Grewal, alleging N.J. Stat. Ann. § 19:34-45's ban on independent expenditures (Count I) and political contributions (Count II) violates the rights of NJBA and its members under the First Amendment to the United States Constitution. (ECF No. 1.) NJBA seeks a declaratory judgment that N.J. Stat. Ann. § 19:34-45's ban is unconstitutional, and an injunction prohibiting Grewal from enforcing the ban, reasonable attorney's fees and costs, and any such other relief as the Court may deem equitable and just. (*Id*. at 19–20.)

Pursuant to the briefing schedule set forth in a Consent Order (ECF No. 79), on August 7, 2020, Grewal filed a Motion for Summary Judgment. (ECF No. 81.) On October 6, 2020, NJBA filed a Cross Motion for Summary Judgment. (ECF No. 82.) On November 24, 2020, Grewal filed a Reply. (ECF No. 83.) On December 8, 2020, CLC filed an Amicus Brief. (ECF No. 91.) On December 18, 2020, NJBA filed a Reply. (ECF No. 92.) The Court held oral argument on March 23, 2021. (ECF No. 98.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

---

[1] "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Citizens United v. FEC*, 558 U.S. 310, 360 (2010) (citing *Buckley v. Valeo*, 424 U.S. 1, 46 (1976)).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Factual disputes that are irrelevant or unnecessary" cannot "preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and

by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

## III. DECISION

The central dispute here is the constitutionality of N.J. Stat. Ann. § 19:34-45, which provides:

> No corporation carrying on the business of a bank, savings bank, co-operative bank, trust, trustee, savings indemnity, safe deposit, insurance, railroad, street railway, telephone, telegraph, gas, electric light, heat or power, canal or aqueduct company . . . shall pay or contribute money or thing of value in order to aid or promote the nomination or election of any person, or in order to aid or promote the interests, success or defeat of any political party.

N.J. Stat. Ann. § 19:34-45. The parties agree this matter is ripe for summary judgment. Draft Tr. Mar. 23, 2021 Oral Arg.

**A. N.J. Stat. Ann. § 19:34-45 Unconstitutionally Bans Independent Expenditures**

**1. The Plain Language and the Statutory Context of N.J. Stat. Ann. § 19:34-45 Suggest It Covers Independent Expenditures**

Grewal argues NJBA has no standing to challenge N.J. Stat. Ann. § 19:34-45, because the statute prohibits only contributions, and does not restrict NJBA's ability to make independent expenditures. (ECF No. 81-1 at 23–24.) First, Grewal states the statute's plain text expressly bars contributions, but it is silent as to independent expenditures. (*Id*. at 25.) Grewal maintains the term "money or thing of value" in N.J. Stat. Ann. § 19:34-45 does not include independent expenditures in light of its usage in federal criminal statutes related to bribery and public corruption, and the phrase "contribute money or thing of value" just confirms a contribution can take non-monetary forms, but does not enlarge the meaning of "contribute" to encompass independent expenditures. (*Id*. at 26–27.) Grewal contends the terms "contribute" and "pay" are at best ambiguous: their dictionary definitions can not only be as broad as what NJBA proposes (*e.g.*, the word "contribute" could mean to furnish or to use one's influence), but also be limited a donation to another specified object. (ECF No. 83 at 10.) Grewal insists the context of N.J. Stat. Ann. § 19:34-45 supports its interpretation: the phrase "pay or contribute," together with the subsequent terms "any person" and "any political party," qualifies the meaning of "pay" to be more consistent with a reading that bars payments to a candidate or political party. (*Id*. at 11 n.2.) Second, Grewal alleges the history of N.J. Stat. Ann. § 19:34-45 confirms the legislature's intent was to prohibit contributions only, not independent expenditures. (ECF No. 81-1 at 27.) Grewal asserts N.J. Stat. Ann. § 19:34-45, enacted in 1911, was modeled on its federal counterpart, 52 U.S.C. § 30118(a), which first appeared in the Tillman Act of 1907, and originally prohibited contributions only; in 1947, Congress amended the Tillman Act to extend its prohibition on

expenditures by inserting the term "expenditure" into the law, but a similar change never occurred to N.J. Stat. Ann. § 19:34-45 even when it was amended in 2001. (*Id*. at 27–28.) Third, Grewal refers to several state election statutes and the Tillman Act that bars "contribution" and "expenditure" at the same time, which purportedly refutes NJBA's expansive definition of the term "contribution" in N.J. Stat. Ann. § 19:34-45, and claims the term is ambiguous and susceptible to more than one reasonable interpretations. (ECF No. 83 at 11–12.)

NJBA maintains N.J. Stat. Ann. § 19:34-45 covers independent expenditures, because (1) the terms "pay" and "contribute" should be afforded their broad ordinary meanings, which cover much more than direct contributions, (2) the statute places no limitation on the recipient of "pay[ments]" or "contribut[ions]," and instead broadly prohibits "aid[ing] or promot[ing]" the election success of a candidate or political party, and (3) the statute bars the giving of a "thing of value," which includes direct speech in support of a candidate or political party. (ECF No. 82-1 at 23.) Taken together, NJBA concludes N.J. Stat. Ann. § 19:34-45 prohibits activities that meet the following four elements: (1) "pay[ing]" or "contribut[ing];" (2) "money" or a "thing of value;" (3) to "aid or promote;" and (4) the "nomination or election" of candidates, or the "interests, success or defeat of" political parties. (*Id*. at 24.) As a result, NJBA argues the statute covers at least two types of independent expenditure: (1) direct speech not coordinated with a candidate or political party; and (2) a money contribution to an independent expenditure-only political action committee ("PAC") advocating on behalf of a particular candidate (*id*.), even under Grewal's definition of the term "contribute" (ECF No. 92 at 10). NJBA asserts the ordinary meanings of the terms "pay," "contribute," and "thing of value" include expenditures, which cannot be disputed by referring to statutes enacted decades after the enactment of N.J. Stat. Ann. § 19:34-45, as they are not probative of the legislative intent underlying N.J. Stat.

Ann. § 19:34-45. (ECF No. 82-1 at 25–26.) NJBA contends its interpretation of "payment" and "contribution" is supported by the statutory context in which terms are used, *i.e.*, when a payment or contribution of money or thing of value aids or promotes the election of candidates or interests of political parties. (ECF No. 92 at 10.) NJBA suggests one should not expect N.J. Stat. Ann. § 19:34-45, enacted in 1911, to use the word "expenditure" to cover what we today call independent expenditures; and the meaning of the term "expenditure" in later statutes does not necessarily materially differ from the plain and ordinary meaning of the terms "pay," "contribute," and "thing of value" in N.J. Stat. Ann. § 19:34-45. (ECF No. 82-1 at 26.) NJBA cites several federal and New Jersey election laws that define "expenditure" almost as broadly as "contribution," and maintains how the two terms are used in these statutes should inform their scope of meaning in N.J. Stat. Ann. § 19:34-45. (ECF No. 92 at 13.) As for the amendment of the Tillman Act, NJBA claims the Congress believed the Tillman Act was originally intended to encompass expenditures, and viewed the 1947 amendment as clarifying that intent rather than adopting a new policy. (*Id.* at 13 n.3.) The Court agrees.

"As with any question of statutory interpretation, [the court's] analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citing *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)). Courts "give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Wall v. Kholi*, 562 U.S. 545, 551 (2011) (citations omitted); *see also United States v. Apfelbaum*, 445 U.S. 115, 121 (1980) ("[A]bsent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language."). Courts "look to statutory context for evidence of congressional intent" and, "[i]n considering statutory context, [] interpret statutes in accordance with their overall scheme." *United States v. Tyson*, 947 F.3d 139,

144 (3d Cir. 2020) (citations omitted); *see also Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014) ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context."); *In re Price*, 370 F.3d 362, 369 (3d Cir. 2004) ("Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations.").

Here, the plain text of N.J. Stat. Ann. § 19:34-45 makes it unlawful for a covered entity to "pay or contribute money or thing of value *in order to aid or promote* the nomination or election of" a candidate or political party, but does not require that candidate or political party to be the direct recipient of such payment or contribution. N.J. Stat. Ann. § 19:34-45 (emphasis added). In contrast, other sections in the same chapter with N.J. Stat. Ann. § 19:34-45 (*i.e.*, Chapter 34. Penalties) use clear language to refer to payments made directly to a particular recipient. For example, N.J. Stat. Ann. § 19:34-39 makes it unlawful to "advance or pay, or cause to be paid, money or other valuable thing, *to or for the use of* any other person" for such purposes as "bribery at any election" and "aid[ing] or assist[ing] any person to evade arrest who is charged with the commission of a crime against the elective franchise." N.J. Stat. Ann. § 19:34-39 (emphasis added). N.J. Stat. Ann. § 19:34-25 makes it unlawful to "make or give any money or other thing of value *to* any member of the district board because of his membership on such board." N.J. Stat. Ann. § 19:34-25 (emphasis added). The lack of similar clear language in N.J. Stat. Ann. § 19:34-45 suggests a legislative intent not to specify the direct recipient of the prohibited payments or contributions under the statute. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."); *Sosa v. Alvarez-Machain*, 542 U.S. 692,

711 n.9 (2004) (citing 2A N. Singer, Statutes and Statutory Construction § 46:06, at 194 (6th rev. ed. 2000)) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

Also, other sections in Chapter 34 use the terms "expenditure" and "expend" interchangeably with the terms "pay" and "contribute." For example, N.J. Stat. Ann. § 19:34-33, titled "*Contributions* by state, county or municipal committees," provides: "No state, county or municipal committee or organization of any political party shall *expend* any money in aid of the candidacy of any candidate for election . . . ." N.J. Stat. Ann. § 19:34-33 (emphasis added). Though N.J. Stat. Ann. § 19:34-35 lists "contributions" and "expenditures" separately in its title "Other contributions and expenditures," its body suggests the two terms may refer to the same item: "Any person who shall *expend*, aid or assist in the *expenditure* of any such money for a purpose not authorized by this title, or for a purpose not named in the statement accompanying *such contribution*, shall be guilty of a crime of the third degree." N.J. Stat. Ann. § 19:34-35 (emphasis added). N.J. Stat. Ann. § 19:34-38, titled "Certain *expenditures* prohibited" provides: "No person shall *pay*, lend or *contribute*, or offer or agree to pay, lend or *contribute*, any money or other valuable consideration to or for any person for any of the following . . . ." N.J. Stat. Ann. § 19:34-38 (emphasis added). N.J. Stat. Ann. § 19:34-39, titled "Other *expenditures* prohibited," makes it unlawful to "*pay*, lend or *contribute*, or offer or promise to *pay*, lend or *contribute*, money or other valuable consideration to or for any voter . . . to induce such voter to vote or refrain from voting at any election . . . ." N.J. Stat. Ann. § 19:34-39 (emphasis added). In a word, under other sections of Chapter 34, the terms "expenditure" and "expend" may refer to the same thing with "pay(ment)" and "contribute" (or contribution). As a result, the terms "contribute" and "pay" in N.J. Stat. Ann. § 19:34-45 may also refer to "expend" or "expenditures," including the

expenditures of "money" and "other valuable consideration." *See In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 253 (3d Cir. 2003) (citing *Sorenson v. Sec. of the Treasury*, 475 U.S. 851, 860 (1986)) ("[I]dentical words used in different parts of the same act are intended to have the same meaning."); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995) (citations omitted) ("[T]he term should be construed, if possible, to give it a consistent meaning throughout the Act. That principle follows from our duty to construe statutes, not isolated provisions.").

The Court need not analyze the terms "contribute," "pay," and "expenditure" appearing in other statutes that are out of N.J. Stat. Ann. § 19:34-45's statutory context, such as the Tillman Act and the election laws of other states. After all, these other statutes are entitled to less weight in interpreting N.J. Stat. Ann. § 19:34-45. *See FAA v. Cooper*, 566 U.S. 284, 301–02 (2012) ("Since the term 'actual damages' [in the Privacy Act] can mean different things in different contexts, statutes other than the Privacy Act provide only limited interpretive aid."); *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)) ("When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'"). Also, the plain language and the statutory context of N.J. Stat. Ann. § 19:34-45 already provide clear guidance in interpreting the terms "pay" and "contribute," which makes it unnecessary to analyze the terms' usage in other unrelated statutes. *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823 (3d Cir. 1999)) ("We 'look to other statutes pertaining to the same subject matter which contain similar terms' only if 'the ordinary meaning of a statute and the statute's legislative history fail to provide sufficient guidance to a term's meaning.'").

Grewal cites N.J. Stat. Ann. §§ 19:44A-3 and 19:44A-8(a)(1) to show "expenditure" and

"contribution" are identified separately in New Jersey's election laws. (ECF No. 83 at 11.) But this does not change the conclusion. First, N.J. Stat. Ann. §§ 19:44A-3 and 19:44A-8(a)(1) belong to a different chapter (*i.e.*, Chapter 44A. Contributions and Expenditures) from Chapter 34. Chapter 44A codifies "The New Jersey Campaign Contributions and Expenditures Reporting Act" (the "Reporting Act"), which was effectuated in 1973. N.J. Stat. Ann. § 19:44A-1. N.J. Stat. Ann. § 19:34-45, enacted more than six decades earlier, is not a part of the Reporting Act, which therefore cannot provide much interpretive aid here. *C.f. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (citing *Northcross v. Bd. of Ed. of Memphis City Schs.*, 412 U.S. 427, 428 (1973)) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). Second, the Reporting Act is enforced under a different legal framework from N.J. Stat. Ann. § 19:34-45. The Reporting Act creates an independent agency, *i.e.*, the New Jersey Election Law Enforcement Commission ("ELEC"), N.J. Stat. Ann. § 19:44A-5, which has (1) the duty to enforce the Reporting Act and "to conduct hearings with regard to possible violations and to impose penalties," and (2) "the authority to initiate a civil action in any court of competent jurisdiction" to enforce the Reporting Act. N.J. Stat. Ann. § 19:44A-6. ELEC "has primary jurisdiction over excess contribution claims" and "exclusive jurisdiction over alleged reporting violations" under the Reporting Act. *Nordstrom v. Lyon*, 35 A.3d 710, 720 (N.J. Super. Ct. App. Div. 2012). For reporting violations found under the Reporting Act, the remedy that ELEC "is empowered to grant is the only available remedy." *Id*. (concluding that the lower court's reliance on N.J. Stat. Ann. § 19:3-7 to devise a remedy for a violation of "the Reporting Act's reporting obligations was misplaced"). Therefore, the Reporting Act is not in the same statutory context with N.J. Stat. Ann. § 19:34-45 to afford

guidance in statutory interpretation here. Third, even assuming the Reporting Act is relevant in interpreting N.J. Stat. Ann. § 19:34-45, it does not support Grewal's interpretation. The Reporting Act does not distinguish between "expenditure" and "contribution" in its statutory definition, because the two terms are defined in the same definition as "includ[ing] all loans and transfers of money or other thing of value to or by any candidate, candidate committee, joint candidates committee . . . ." N.J. Stat. Ann. § 19:44A-3d.

Finally, the legislative history of N.J. Stat. Ann. § 19:34-45, especially the failure to add the term "expenditure" in its 2001 amendment, does not change the conclusion. "[S]ilence in the legislative history, no matter how clanging, cannot defeat the better reading of the text and statutory context." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) (citing *Sedima, S. P. R. L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985)).

In conclusion, the plain language and the statutory context of N.J. Stat. Ann. § 19:34-45 clearly demonstrate the terms "pay[ment]" and "contribut[ion]" may refer to an "expenditure." The direct recipient of such payments and contributions is not limited to a candidate or political party. Therefore, "pay[ment]" and "contribut[ion]" in N.J. Stat. Ann. § 19:34-45 may refer to an independent expenditure.

### 2. The Attorney General's Interpretation and the Enforcement History Do Not Support Grewal's Interpretation

Grewal claims New Jersey has never interpreted N.J. Stat. Ann. § 19:34-45 to cover independent expenditures: the Attorney General never construed the statute to prohibit expenditures in its opinions; the State never enforced the statute against a covered entity for making independent expenditures; the Attorney General confirmed the statute did not extend to independent expenditures. (ECF No. 81-1 at 28–29.) Grewal states the government's long history of failing to enforce a statute in a particular way is relevant evidence that the statute does not

grant such a power, and New Jersey courts defer to the longstanding interpretation of the state agency charged with enforcing a statute even if it is taken in litigation. (ECF No. 83 at 14–15.) Grewal argues the doctrine of judicial estoppel prevents the reversal of the Attorney General's position on the meaning of N.J. Stat. Ann. § 19:34-45 in the future. (*Id*. at 16 n.5.) NJBA contends the absence of the Attorney General's interpretive guidance does not equate to a limiting instruction concerning N.J. Stat. Ann. § 19:34-45, and the Attorney General's confirmation is a litigation position, which does not bind future Attorneys General or remove the statute's chilling effect on NJBA's future activities. (ECF No. 82-1 at 27.) The Court agrees.

The Court is not bound by an Attorney General's interpretation of N.J. Stat. Ann. § 19:34-45. *Essex Cnty. Sheriff's Officers PBA Loc. 183 v. Dep't of the Treasury*, Civ. A. No. A-1228-17T2, 2019 N.J. Super. Unpub. LEXIS 1368, at *23 (N.J. Super. Ct. App. Div. June 14, 2019) (citing *Clark v. Degnan*, 394 A.2d 914, 927 (N.J. Super. Ct. Law Div. 1978)) ("[T]he Attorney General's statutory interpretation, as the legal advisor to most state agencies, is considered 'strongly persuasive' but ultimately not binding on courts."); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 395 (1988) ("[T]he Attorney General does not bind the state courts or local law enforcement authorities," and courts "are unable to accept her interpretation of the law as authoritative.").

Even if the Court affords the Attorney General's alleged interpretation of N.J. Stat. Ann. § 19:34-45 with deference, the statute's enforcement history does not confirm that interpretation. In *Bank of New Jersey ("BNJ")*, a bank officer paid $1,000 for ten tickets to a reception and dinner, and the payment was made to a campaign committee named after a candidate for the office of mayor. *State v. BNJ*, 354 A.2d 693, 694–95 (N.J. Super. Law Div. 1976). The *BNJ* court, after finding that (1) "[r]eceptions and dinners [we]re not commonplace events at a price

of $100 a ticket" and (2) "the proceeds were for the purpose of aiding or promoting the election of a person," concluded "this was a payment of money prohibited by" N.J. Stat. Ann. § 19:34-45. *Id.* at 695. Under Grewal's interpretation, the *BNJ* court must have considered the payment not to be an independent expenditure, since it was covered by N.J. Stat. Ann. § 19:34-45. And one would expect the *BNJ* court to lay out that consideration, particular when little information was provided as to how that payment to the campaign committee would be expended, because "it is sometimes difficult for the State to distinguish independent from coordinated expenditures." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 n.7 (4th Cir. 2008). However, the *BNJ* court neither considered the possibility that the payment was an independent expenditure,[2] nor provided any factual information of the campaign committee other than its name. Such information could have shown whether the campaign committee was similar to a super PAC that "makes only independent expenditures and cannot contribute to candidates." *McCutcheon v. FEC*, 572 U.S. 185, 193 n.2 (2014). Instead, the *BNJ* court found N.J. Stat. Ann. § 19:34-45 was "*abundantly clear* and its application to this case *need[ed] no further interpretation or explanation*." *BNJ*, 354 A.2d at 695 (emphasis added). In other words, whether or not the payment was an independent expenditure was not vital to the applicability of N.J. Stat. Ann. § 19:34-45 in *BNJ*. Therefore, the enforcement history does not show N.J. Stat. Ann. § 19:34-45 excludes independent expenditures from its coverage.

---

[2] "A transfer for the benefit of a candidate may be either a contribution or an independent expenditure, depending on the degree of control the candidate or her campaign committee exercises over the money." Frances R. Hill, *Corporate Philanthropy and Campaign Finance: Exempt Organizations as Corporate-Candidate Conduits*, 41 N.Y.L. Sch. L. Rev. 881, 898 (1997). "A contribution to a PAC is treated as a contribution to the official if the PAC is controlled by the official or 'any municipal finance dealer whatsoever.'" *Free & Fair Election Fund v. Mo. Ethics Comm'n*, 252 F. Supp. 3d 723, 744 (W.D. Mo. 2017) (citing *Blount v. SEC*, 61 F.3d 938, 940 (D.C. Cir. 1995)).

### 3. Constitutional Avoidance Is Not Applicable Here

Grewal maintains the canon of constitutional avoidance disfavors NJBA's interpretation of N.J. Stat. Ann. § 19:34-45, which renders the statute vulnerable to a constitutional attack, when the statute is also susceptible to Grewal's alternative interpretation that avoids the constitutional attack. (ECF No. 81-1 at 30.) Grewal alleges NJBA previously interpreted the statute to not cover independent expenditures, in a 2011 presentation and in a 2015 letter request for an advisory opinion from the Attorney General (*id*. at 29), which shows Grewal's interpretation is reasonable (ECF No. 83 at 9). Grewal suggests the Court, if still having doubts about the meaning of N.J. Stat. Ann. § 19:34-45, should abstain from deciding the issue and allow New Jersey state courts to interpret the statute in the first place. (ECF No. 81-1 at 30 n.3.) NJBA contends Grewal's interpretation of N.J. Stat. Ann. § 19:34-45 would require redrafting the statute, which is not allowed when invoking constitutional avoidance. (ECF No. 92 at 11–12.) NJBA explains its alleged prior interpretations of N.J. Stat. Ann. § 19:34-45 were irrelevant: the 2011 presentation was a draft outline to a "Proposed CLE Program" authored by NJBA's legal counsel, and did not represent NJBA's view of the statute; the 2015 request for an advisory opinion was submitted by the same legal counsel to ELEC, and did not purport to interpret the statute, but rather presented a legal argument as to why the statute should not cover independent expenditures. (ECF No. 82-1 at 27 n.1.) The Court agrees.

The canon of constitutional avoidance does not apply here. "Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). "The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." *Clark v.*

*Suarez Martinez*, 543 U.S. 371, 385 (2005) (citations omitted); *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 516 (2009) (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts.").

As demonstrated above, the language of N.J. Stat. Ann. § 19:34-45 is not ambiguous. Therefore, the canon of constitutional avoidance is inapplicable, and the Court need not abstain from interpreting N.J. Stat. Ann. § 19:34-45. *Houston v. Hill*, 482 U.S. 451, 469 (1987) (citing *Harman v. Forssenius*, 380 U.S. 528, 534 (1965)) ("[W]hen a statute is not ambiguous, there is no need to abstain even if state courts have never interpreted the statute."); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 n.3 (1978) ("Abstention may appropriately be denied where, as here, there is no ambiguity in the challenged state statute.").

### 4. As a Remedy, the Court Declares N.J. Stat. Ann. § 19:34-45 Does Not Ban Any Entity from Making Independent Expenditures

Since N.J. Stat. Ann. § 19:34-45 covers independent expenditures, it violates the First Amendment. *Citizens United*, 558 U.S. at 372 (holding that "2 U.S.C. § 441b's restrictions on corporate independent expenditures" violated the First Amendment); *see also Gen. Majority PAC v. Aichele*, Civ. A. No. 14-332, 2014 U.S. Dist. LEXIS 111905, at *15 (M.D. Pa. Aug. 13, 2014) (holding that an election regulation which "prohibit[ed] corporations and unincorporated associations from contributing to political groups that ma[d]e only independent expenditures" violated the First Amendment); *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) ("[B]ecause *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations."). As a result,

the Court must devise a proper remedy.

When a statute is found to be unconstitutional, "invalidating the statute entirely is not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 323 (2006). "[A] federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it," even if the First Amendment is involved. *Brockett v. Spokane Arcades*, 472 U.S. 491, 502 (1985). Accordingly, two salvaging mechanisms are available for an invalidated statute: "(a) assigning a narrow meaning to the language of the statute itself, or (b) deleting that portion of the statute that is unconstitutional, while preserving the remainder of the statute intact." *ACLU v. Reno*, 217 F.3d 162, 177 (3d Cir. 2000), *vacated and remanded on other grounds*, 535 U.S. 564 (2002) (citations omitted); *see also Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1194 (5th Cir. 2000) (citations omitted) (describing "two mechanisms to preserve unconstitutional statutes from wholesale invalidation," including: (1) "if a statute is readily susceptible to a narrowing construction that will remedy the constitutional infirmity, the statute will be upheld," and (2) "[i]f the language is not readily susceptible to a narrowing construction, but the unconstitutional language is severable from the remainder of the statute, 'that which is constitutional may stand while that which is unconstitutional will be rejected'").

Applying the first mechanism, the Court would simply assign a narrowing meaning to N.J. Stat. Ann. § 19:34-45, by declaring the statute does not ban any entity from making independent expenditures. Applying the second mechanism, the Court would delete the two phrases "in order to aid or promote the nomination or election of" and "in order to aid or promote the interests, success or defeat of" from N.J. Stat. Ann. § 19:34-45, because the two phrases enable the statute to cover independent expenditures in violation of the First Amendment. But

this is not enough, because the deletion would result in a statute that reads: "No corporation carrying on the business of a bank . . . shall pay or contribute money or thing of value [to] any person, or any political party." This does not solve the constitutional problem, because N.J. Stat. Ann. § 19:34-45 should not prohibit "any person" from receiving payments or contributions from a covered entity, when such payments or contributions could include independent expenditures. Consequently, the statute has to be further modified as: "[n]o corporation carrying on the business of a bank . . . shall pay or contribute money or thing of value to any candidate for nomination or election, or any political party." In comparison, the Court finds the second mechanism is less appropriate, because the two phrases are not readily severable from the remainder of N.J. Stat. Ann. § 19:34-45, and therefore adopts the first mechanism as the proper remedy.

Accordingly, the Court concludes N.J. Stat. Ann. § 19:34-45 bans independent expenditures, which violates the First Amendment. As to Count I, NJBA' Cross Motion for Summary Judgment is **GRANTED** and, and Grewal's Motion for Summary Judgment is **DENIED**. The Court hereby declares N.J. Stat. Ann. § 19:34-45 does not ban any entity from making independent expenditures.

**B.    N.J. Stat. Ann. § 19:34-45's Ban on Political Contributions Is Constitutional**

The parties agree N.J. Stat. Ann. § 19:34-45 is subject to the intermediate scrutiny review (ECF No. 81-1 at 31; ECF No. 82-1 at 29), which the Court conducts in the following. "Under intermediate scrutiny, the [g]overnment may employ the means of its choosing 'so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation,' and does not 'burden substantially more speech than is necessary to further' that interest." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213–14 (1997) (quoting

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994)).

### 1. N.J. Stat. Ann. § 19:34-45 Was Enacted to Address a Real Risk of *Quid Pro Quo* Corruption and Its Appearance

Grewal asserts N.J. Stat. Ann. § 19:34-45 addresses New Jersey's important interest in preventing both *quid pro quo* corruption and its appearance. (ECF No. 81-1 at 33.) Grewal argues this is shown by the statute's historical context: (1) it paralleled the Tillman Act, which the Supreme Court found was intended to prevent corruption and its appearance; (2) former New Jersey Governor Woodrow Wilson ("Governor Wilson"), who signed the statute into existence, framed the contribution prohibition as necessary to prevent elected officials from selling their votes, and mentioned in a public speech a specific case of a bank using financial coercion to pressure a New Jersey legislator to vote a certain way on a legislation; and (3) the statute's enactment was motivated by several incidents of actual *quid pro quo* or its appearance, including the allegations that the former U.S. President Theodore Roosevelt ("President Roosevelt") accepted contributions from J.P. Morgan & Co. ("J.P. Morgan") in exchange for its immunity from prosecution, and the testimony in the Armstrong Committee hearings of 1905 that corporate contributions put lawmakers under a "moral obligation" to support their donors' interests. (*Id*. at 12, 17, 34, 36; ECF No. 83 at 25.) Grewal contends this historical analysis outweighs the post-enactment advisory opinions of certain Attorneys General, which purportedly described a motivation for enacting N.J. Stat. Ann. § 19:34-45 as reducing corporate influence or access, because all that matters here is whether the anticorruption rationale is one of the reasons that justify N.J. Stat. Ann. § 19:34-45. (ECF No. 81-1 at 35.) Grewal asserts such post-enactment opinions are not legitimate tools to discern a legislature's purpose. (ECF No. 83 at 24.)

Grewal maintains actual and apparent *quid pro quo* corruption remains a threat today: (1) in 1995, a New Jersey state official pleaded guilty to accepting kickbacks in exchange for

steering a municipal bond underwriting contract to a particular bank; (2) in 1994, the U.S. Securities and Exchange Commission ("SEC") investigated contributions made to New Jersey party officials by underwriters of a $224 million public bond issue; (3) in 2016 and 2017, several U.S. banks resolved federal charges that they had paid money and in-kind contributions to government officials in exchange for government contracts and other government benefits; (4) in 2019, the New Jersey Attorney General prosecuted five public officials accused of exchanging lucrative government work for bribes as low as $150; (5) in 2005, federal prosecutors charged eleven New Jersey public officials accused of a pay-to-play scheme in which they allegedly accepted bribes as low as $1,000; (6) in the three months since Grewal filed its opening brief, federal prosecutors have filed new criminal charges accusing at least two New Jersey officials of bribery and kickback schemes; and (7) if there is no present epidemic in New Jersey of *quid pro quo* corruptions by banks, it only shows N.J. Stat. Ann. § 19:34-45 is effective in preventing such corruptions. (*Id*. at 26–28.) Grewal stresses the public opinion confirms corporate contributions, even those that do not result in criminal convictions, give rise to an appearance of corruption. (*Id*. at 28 n.8.) Grewal explains N.J. Stat. Ann. § 19:34-45 could also be a prophylactic law that prevents corruption, and the Court should not second-guess a legislative determination as to the need for prophylactic measures, especially for longstanding laws. (ECF No. 81-1 at 36.) Grewal points out other states have enacted similar laws that bar contributions from corporations and banks, which supports finding N.J. Stat. Ann. § 19:34-45 advances the governmental interest in preventing actual or apparent *quid pro quo* corruption. (*Id*. at 38.)

NJBA cites the Formal Opinions by New Jersey's Attorneys General that set forth the legislative intents underlying N.J. Stat. Ann. § 19:34-45 as curtailing corporate influence over government officials and protecting shareholders, which are not permissible bases for infringing

First Amendment rights. (ECF No. 82-1 at 31–32.) NJBA alleges the Formal Opinions are based on the Supreme Court's detailed recounting of the congressional motivation for restricting corporate campaign finance at the beginning of the twentieth century, and are consistent with several secondary authorities that described the impetus behind the Tillman Act as the fear of aggregated money, through the corporate form, being used to unduly influence politicians and the government. (*Id*. at 32.) NJBA asserts Grewal has neither shown any historical instances of corruption that actually motivated the enactment of N.J. Stat. Ann. § 19:34-45, nor provided any other form of the statute's legislative history. (ECF No. 92 at 21–22.) NJBA argues Grewal has not established the dangers of *quid pro quo* corruption are real, because Grewal fails to produce: (1) the legislative history of N.J. Stat. Ann. § 19:34-45; (2) concrete historical records demonstrating a concern of *quid pro quo* corruption in the banking industry; (3) evidence of recent public scandals that shows official acts were corruptly rewarded to banks in exchange for campaign contributions; (4) convictions based on banks using contributions to secure political favors; and (5) evidence that shows political contributions by banks result in an appearance of *quid pro quo* corruption. (ECF No. 82-1 at 33–37.) NJBA stresses even a prophylactic ban must be supported by experience that confirms a serious threat of corruption. (*Id*. at 38.) NJBA claims N.J. Stat. Ann. § 19:34-45 is an outlier among state election laws, because it bans banks from making campaign contributions while allowing other corporations to do so. (*Id*. at 39.) NJBA argues the uniqueness of New Jersey's approach undermines its focus on banks engaging in *quid pro quo* corruption through political contributions. (*Id*. at 39–40.)

CLC points out federal law, numerous states and localities have long prohibited political contributions from corporations and banks in recognition of the pervasive threat of actual and apparent corruption, which indicates N.J. Stat. Ann. § 19:34-45 is neither unique nor an outlier.

(ECF No. 91 at 10–13.) CLC states the financial sector has experienced numerous pay-to-play scandals around the country in recent years: the SEC has repeatedly brought civil enforcement actions against financial services firms and professionals for providing illegal campaign contributions and kickbacks to public officials; state authorities have charged banks and financial institutions for violating anticorruption laws. (*Id*. at 23–24.) Citing a number of research findings, CLC claims the appearance-of-corruption concerns are clear from the public's awareness of banks' spending on federal campaigns. (*Id*. at 25.) CLC contends N.J. Stat. Ann. § 19:34-45 addresses New Jersey's interest in preventing actual and apparent corruption in the banking industry, and promotes the closely related interest in preserving public confidence in democratic self-governance. (*Id*. at 26.) CLC maintains the First Amendment protects a democratic system that depends on the great body of the people, not on an inconsiderable proportion or a favored class of it. (*Id*. at 27.) CLC insists N.J. Stat. Ann. § 19:34-45 helps counter the erosion of public faith in our democracy, by closing the most direct channel for banks to control state elections and political institutions. (*Id*. at 28.)

The Court finds the underlying legislative intent of N.J. Stat. Ann. § 19:34-45 includes addressing a real risk of *quid pro quo* corruption and its appearance in New Jersey's banking sector.

### a.    There Is No Material Factual Dispute on the Legislative Intent

The Supreme Court "has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption," and has "consistently rejected attempts to suppress campaign speech based on other legislative objectives." *McCutcheon*, 572 U.S. at 206–07 (citations omitted). "[I]t is not an acceptable governmental objective to level the playing field, or to level electoral opportunities, or to

equalize the financial resources of candidates." *Id*. at 207 (citations omitted). Neither "antidistortion rationale," *i.e.*, "prevent[ing] corporations from obtaining an unfair advantage in the political marketplace by using resources amassed in the economic marketplace," nor "shareholder-protection interest," *i.e.*, "protecting dissenting shareholders from being compelled to fund corporate political speech," is a legitimate reason to justify corporate-speech restrictions. *Citizens United*, 558 U.S. at 350, 361–62 (citations and internal quotation marks omitted). The only legitimate anticorruption "interest must be limited to a specific kind of corruption—*quid pro quo* corruption." *McCutcheon*, 572 U.S. at 227. Here, Grewal asserts N.J. Stat. Ann. § 19:34-45 was enacted to prevent *quid pro quo* corruption and its appearance (ECF No. 81-1 at 33), which represents a legitimate governmental interest. NJBA argues N.J. Stat. Ann. § 19:34-45 was enacted to curtail corporate influence over government officials and to protect shareholders (ECF No. 82-1 at 39), which do not represent a legitimate governmental interest. As a result, the Court must determine whether there is a material factual dispute over the legislative intent underlying N.J. Stat. Ann. § 19:34-45, such that the disposition of Count II is premature at this stage.

To survive an intermediate scrutiny review in the First Amendment context, Grewal must show the state legislature enacted N.J. Stat. Ann. § 19:34-45 with a genuine intent to address *quid pro quo* corruption and its appearance. *See Nixon v. Shrink Mo. Gov't Pac*, 528 U.S. 377, 393–94 (2000) (finding that a state law restriction on campaign contribution, which was challenged on First Amendment grounds, served the governmental interest of addressing actual or perceived corruption, based on multiple pieces of evidence that the state legislature enacted the restriction with a genuine concern for *quid pro quo* corruption); *see also Seaton v. Wiener*, 22 F. Supp. 3d 945, 951 (D. Minn. 2014) (concluding that the plaintiffs "demonstrated a substantial

likelihood of success on the merits of their claim" that a limitation on political contribution violated the First Amendment, because "[t]he legislative history of the statute cast[] significant doubt on [the government's] contention that the statute was enacted to prevent *quid pro quo* corruption"); *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1058 (D. Haw. 2012), *aff'd*, 786 F.3d 1182 (9th Cir. 2015) (finding that a contractor contribution ban under Hawaii law was supported by a legitimate governmental interest, because "[t]he legislative history of [the ban] confirm[ed] that Hawaii's Legislature passed the government contractor contribution ban in large part precisely because of these concerns—prevention of both actual corruption and its appearance"); *729, Inc. v. Kenton Cnty. Fiscal Ct.*, 515 F.3d 485, 491 (6th Cir. 2008) (citing *White River Amusement Pub, Inc., v. Town of Hartford*, 481 F.3d 163, 171–72 (2d Cir. 2007)) (concluding that, for an ordinance challenged on First Amendment grounds to survive intermediate scrutiny, "the government must have had the actual purpose of" addressing the problem it "sought to address"). An actual or completed transaction of *quid pro quo* corruption is not needed to show an appearance thereof. *See McCutcheon*, 572 U.S. at 207 (quoting *Buckley*, 424 U.S. at 27) ("In addition to 'actual *quid pro quo* arrangements,' Congress may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates."); *see also Ognibene v. Parkes*, 671 F.3d 174, 183 (2d Cir. 2011) (citing *McConnell v. FEC*, 540 U.S. 93, 150 (2003)) ("It is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption."); *Lair v. Motl*, 873 F.3d 1170, 1180 (9th Cir. 2017) ("Montana need not show any completed *quid pro quo* transactions to satisfy its burden [of showing the risk of actual or perceived *quid pro quo* corruption]. It simply must show the risk of actual or perceived *quid pro quo* corruption is not illusory.").

"The legislature's motivation is itself a factual question." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (citations omitted); *see also Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) ("Legislative motivation or intent is a paradigmatic fact question."). "Sources of legislative intent are the language of a statute, the policy behind a statute, concepts of reasonableness, and legislative history." *Parker v. Esposito*, 677 A.2d 1159, 1162 (N.J. Super. Ct. App. Div. 1996) (citations omitted). A court may also consider "the historical context of the statute, and the specific sequence of events leading to passage of the statute" to determine the legislative intent. *Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) (citations omitted). Here, the legislative intent underlying N.J. Stat. Ann. § 19:34-45 affects the constitutionality of the statute. It is therefore a material factual issue that may "affect the outcome of the suit under governing law." *Kaucher*, 455 F.3d at 423. However, nowhere in the plain text of N.J. Stat. Ann. § 19:34-45 indicates a legislative intent, and the record contains no information of the statute's legislative history.[3] Nevertheless, the parties provide other relevant but conflicting information regarding the legislative intent underlying N.J. Stat. Ann. § 19:34-45. But the Court does not find such conflicting information gives rise to a material factual dispute.

On the one hand, Grewal draws on the historical context to show the state legislature passed N.J. Stat. Ann. § 19:34-45 with an intent to address *quid pro quo* corruption and its appearance. The relevant historical context started with several incidents of actual or perceived *quid pro quo* corruption: President Roosevelt was accused of stopping an investigation into trusts affiliated with J.P. Morgan, after J.P. Morgan contributed $150,000 to his 1904 reelection campaign; in the Armstrong Committee hearings of 1905, a number of financial institutions admitted having funneled campaign contributions to national political parties, and a senator

---

[3] Grewal concedes "no legislative history is available for N.J. Stat. Ann. § 19:34-45." (ECF No. 82-1 at 16.)

referred to a "moral obligation" of political candidates not to attack the interests of their sources of campaign contribution. (ECF No. 81-1 at 12–13.) Grewal alleges these incidents led to the passing of the Tillman Act, and cites several statements of President Roosevelt that described the act's objective as preventing corruption, rather than curtailing corporation influence in politics. (*Id*. at 13–14.) Grewal claims the Tillman Act inspired many state legislatures to pass state laws modeled on the Tillman Act. (*Id*. at 15.) Among them was N.J. Stat. Ann. § 19:34-45, behind which Governor Wilson acted as a driving force. (*Id*. at 16.) Grewal refers to several statements of Governor Wilson made in 1910 and 1911 that advocated for anticorruption legislations, framing a contribution prohibition as necessary to prevent elected officials from selling their votes. (*Id*. at 16–18, 34.) In particular, Governor Wilson mentioned a specific example of *quid pro quo* corruption in New Jersey's banking sector during a public speech in 1911. (*Id*. at 17–18.) Eventually, Governor Wilson signed N.J. Stat. Ann. § 19:34-45 into existence. (*Id*. at 34.) Such developments together constitute the historical context around the enactment of N.J. Stat. Ann. § 19:34-45 in 1911, and are relevant facts showing the statute was enacted to address *quid pro quo* corruption and its appearance.

Governor Wilson's statements made in 1910 and 1911, standing alone, are not of much evidentiary value, because they were not made upon signing or approving N.J. Stat. Ann. § 19:34-45. *C.f. Perez v. Rent-A-Center, Inc.*, 892 A.2d 1255, 1272 (N.J. 2006) (citations omitted) ("[T]he governor's action in approving or vetoing a bill constitutes a part of the legislative process, and the action of the governor upon a bill may be considered in determining legislative intent."); *Loveladies Prop. Owners Ass'n v. Raab*, 348 A.2d 540, 542 (N.J. Super. Ct. App. Div. 1975) ("Consideration of [statements made by the governor in approving a bill] may be appropriate in ascertaining legislative intent."). Nevertheless, the Court may consider these

statements for the legislative intent determination, where, as here, there is little evidence of the legislative history of N.J. Stat. Ann. § 19:34-45. *See Nobrega v. Edison Glen Assocs.*, 772 A.2d 368, 376 (N.J. 2001) (citations omitted) ("[A]lthough we may look to statements by the executive branch in determining legislative intent, we afford little weight to such sources where the legislative history itself speaks clearly."). Clearly, Governor Wilson's statements support finding an anticorruption rationale underlying N.J. Stat. Ann. § 19:34-45.

On the other hand, NJBA proffers facts to show the legislative intent underlying N.J. Stat. Ann. § 19:34-45 did not include addressing *quid pro quo* corruption and its appearance.

First, NJBA refers to New Jersey's Attorneys General Formal Opinions released in 1979 and 1983, which set forth the legislative purpose of N.J. Stat. Ann. § 19:34-45 as curtailing corporate influence over government officials and protecting shareholders. (ECF No. 82-1 at 31–32.) The Formal Opinions, as "statements by the executive branch," may be considered in the legislative intent determination. *Nobrega*, 772 A.2d at 376. But the evidentiary value of the Formal Opinions, if any, is limited, because NJBA has not shown these Attorneys General actually participated in the legislative process of N.J. Stat. Ann. § 19:34-45. *C.f. P. T. & L. Constr. Co. v. Comm'r, Dep't of Transp.*, 273 A.2d 353, 354 (N.J. 1971) (regarding the opinion of "the Attorney General, who had prepared the said statute," as reflecting the legislative intent of the statute). In other words, the Formal Opinions—released decades after N.J. Stat. Ann. § 19:34-45's enactment and by someone not involved in legislating N.J. Stat. Ann. § 19:34-45— should have less evidentiary value than the "post-enactment statements of legislators" who actually participated in the statute's legislative process. However, such post-enactment statements by legislators "as extrinsic evidence of legislative intent are disapproved." *Coal. for Quality Health Care v. N.J. Dept. of Banking & Ins.*, 817 A.2d 347, 351 (N.J. Super. Ct. App.

Div. 2003) (citing *N.J. Coal. of Health Care Prof'ls, Inc. v. N.J. Dep't of Banking & Ins.*, 732 A.2d 1063, 1091 (N.J. Super. Ct. App. Div. 1999)). This is because "[t]hese subsequent statements of legislative history have the potential to allow legislators to informally re-write the law simply by proclaiming that they really intended something other than what the legislative history indicates." *Schroeder v. Cnty. of Atl.*, 112 A.3d 613, 620 (N.J. Super. Ct. Law Div. 2014). Therefore, the Formal Opinions, which have even less evidentiary value than the legislators' post-enactment statements, are irrelevant in the legislative intent determination here.

Second, NJBA cites several early Supreme Court decisions indicating the Tillman Act was enacted with two impermissible legislative intents: the antidistortion and the shareholder-protection rationales. (ECF No. 82-1 at 16 (citing *Pipefitters Loc. Union v. United States*, 407 U.S. 385, 413 (1972) (finding that "the dual purposes" underlying 18 U.S.C. § 610[4] were to "eliminate the corroding effect of money employed in elections by aggregated powers" and "to protect minority interests from overbearing union leadership"); *United States v. Cong. of Indus. Orgs. ("CIO")*, 335 U.S. 106, 113 (1948) (finding that 34 Stat. 864–65 "seem[ed] to have been motivated by two considerations:" (1) "the necessity for destroying the influence over elections which corporations exercised through financial contribution," and (2) "the feeling that corporate

---

[4] The following is a brief introduction of the historical development of the Tillman Act. "Congress first made financial contributions to federal candidates by corporations illegal by enacting the Tillman Act, 34 Stat. 864 (1907)." *FEC v. Nat'l Right to Work Comm'n. ("NRWC")*, 459 U.S. 197, 208–09 (1982). In 1921, the Supreme Court declared a portion of the Tillman Act unconstitutional. *Weber v. Heaney*, 793 F. Supp. 1438, 1444 (D. Minn. 1992) (citing *Newberry v. United States*, 256 U.S. 232, 258 (1921)). "After *Newberry*, Congress tightened the surviving portions of the Tillman Act by enacting the Federal Corrupt Practices Act of 1925, 43 Stat. 1070 (1925) (codified at 18 U.S.C. §§ 610-17)." *Id.* "From 1925 until 1976, the proscriptions now set out in section 441b were codified as section 610 of the Federal Corrupt Practices Act of 1925, 18 U.S.C. § 610 (1970) (repealed 1976)." *FEC v. Lance*, 617 F.2d 365, 367 n.1 (5th Cir. 1980). "Although it is now a part of the Federal Election Campaign Act, 2 U.S.C. §§ 431-455 (1976), section 441(b) continues to be known as the Federal Corrupt Practices Act." *Id.* (citing *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788 n.26 (1978)).

officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders")).) But this does not negate anticorruption rationale as an underlying legislative intent of N.J. Stat. Ann. § 19:34-45, because these Supreme Court decisions only involved the legislative intent underlying the Tillman Act, not N.J. Stat. Ann. § 19:34-45. Even if the legislative intent underlying the Tillman Act is probative of that for N.J. Stat. Ann. § 19:34-45, these decisions only suggest the Tillman Act was enacted with two impermissible intents, but cannot preclude the anticorruption rationale as another possible underlying legislative intent. *See FEC v. Beaumont*, 539 U.S. 146, 154 (2003) (citations omitted) (finding that "the original rationales for" 2 U.S.C. § 441b included "barring corporate earnings from conversion into political 'war chests,'" "prevent[ing] corruption or the appearance of corruption," and "protect[ing] the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed"); *NRWC*, 459 U.S. at 207–08 (citations omitted) (recognizing that 2 U.S.C. § 441b had two underlying purposes: the first was to contain the political "war chest" of corporations, and the second was to "protect the individuals" who opposed the political candidates supported by their "corporation or union," but "the overriding concern behind the enactment of . . . the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts" and "the appearance of corruption"). Notably, *CIO* mentioned a potential anticorruption rationale underlying the Tillman Act. *CIO*, 335 U.S. at 142 (Frankfurter, J., concurring) ("[V]ery little in the legislative history directly suggests this evil [of corruption], although there are inferences implicit in some statements that it was not entirely out of mind. So also with the [g]overnment's argument."). This anticorruption rationale involves a concern for *quid pro quo* corruption and its appearance: the government's

brief in *CIO* stated one reason for the contribution ban in the Tillman Act was "because the large single contributions imply resulting obligations and, therefore, can breed corruption." *Id.* at 142 n.21 (Frankfurter, J., concurring).

In fact, the antidistortion and the anticorruption rationales are closely related. *See NRWC*, 459 U.S. at 209–10 ("In order to prevent both actual and apparent corruption, Congress aimed a part of its regulatory scheme at corporations. [2 U.S.C. § 441b] reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation."). The *NRWC* court framed the first underlying purpose of 2 U.S.C. § 441b, *i.e.*, containing the political war chest of corporations, as addressing two issues: (1) the "special advantages" of corporations in the political marketplace resulting from their "substantial aggregations of wealth amassed," and (2) the concern that corporate contributions "could be used to incur political debts from legislators." *Id.* at 207 (citing *United States v. Auto. Workers*, 352 U.S. 567, 579 (1957)). Such "political debts" could result in actual or perceived *quid pro quo* corruption. *See Citizens United*, 558 U.S. at 452 (Stevens, J., dissenting) (citing *McConnell*, 540 U.S. at 143) (suggesting that "*quid pro quo* debts" did not have to "take the form of outright vote buying or bribes," but "encompass[ed] the myriad ways in which outside parties may induce an officeholder to confer a legislative benefit in direct response to, or anticipation of, some outlay of money the parties ha[d] made or w[ould] make on behalf of the officeholder"). In other words, if a statute was enacted with an antidistortion rationale, it not only does not preclude the anticorruption rationale as another underlying legislative intent, but suggests a possibility that the legislative passed statute with an anticorruption purpose.

Therefore, the material issue here is not whether the state legislature passed N.J. Stat. Ann. § 19:34-45 with any impermissible intent in mind, but whether preventing *quid pro quo*

corruption and its appearance was one legislative intent underlying the statute. *See Protect My Check, Inc. v. Dilger*, 176 F. Supp. 3d 685, 697 (E.D. Ky. 2016) (finding that "preventing *quid pro quo* corruption" was "a valid reason and a sufficiently important interest for Kentucky's restriction on corporate contributions," despite the plaintiff's emphasis that the "anti-distortion rationale" was no longer a justification); *Stop This Insanity v. FEC*, 902 F. Supp. 2d 23, 47 (D.D.C. 2012) (citing *NRWC*, 459 U.S. at 206–10) (finding that § 441b's solicitation restrictions were constitutional and rejecting the plaintiff's argument "that the Supreme Court's decision in *NRWC*, upholding [§ 441b's] solicitation restrictions, was only 'based upon an anti-distortion rationale thoroughly rejected by the Supreme Court in *Citizens United*,'" because "the Supreme Court in *NRWC* also relied upon the well-established and compelling anti-corruption rationale in upholding § 441b's solicitation restrictions"); *Ognibene*, 671 F.3d at 195 n.21 ("[Because] the anti-corruption interest is a legitimate justification for campaign contribution restrictions, [the court] need not consider the extent to which the entity ban could have been justified by the anti-distortion and dissenting-shareholder rationales."); *Shrink Mo. Gov't PAC v. Maupin*, 922 F. Supp. 1413, 1420 (E.D. Mo. 1996) (citation omitted) (finding that a challenged contribution limitation "can be construed as embodying a compelling state interest," because the government proffered the "interest in stopping corruption or the appearance of corruption," though another proffered "governmental interest in providing a 'level playing field' was clearly rejected as a 'compelling state interest' by the *Buckley* Court").

Accordingly, the evidence offered by NJBA could only suggest the state legislature enacted N.J. Stat. Ann. § 19:34-45 with certain impermissible intents, which does not affect the outcome of this case. Such evidence cannot preclude the anticorruption rational as an additional legislative intent. As a result, the Court finds no material factual dispute as to the underlying

legislative intent for N.J. Stat. Ann. § 19:34-45.

> **b.** **The Risk of *Quid Pro Quo* Corruption and Its Appearance Is Real**

To pass the intermediate scrutiny review, Grewal must show the risk or the harm of *quid pro quo* corruption and its appearance is "real, not merely conjectural." *King v. Governor of N.J.*, 767 F.3d 216, 238 (3d Cir. 2014) (citations omitted); *see also Lair*, 873 F.3d at 1178 (citations omitted) (holding that, to satisfy the burden of showing the state's campaign contribution limitations furthered the important state interest of preventing actual or perceived *quid pro quo* corruption, the state "must show the risk of actual or perceived *quid pro quo* corruption [wa]s more than 'mere conjecture'"); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)) ("Intermediate scrutiny requires that the state 'demonstrate that the harms it recites are real.'"). To decide whether the harms of corruption are real, the Court's "task is merely to determine whether the legislature has 'drawn reasonable inferences based on substantial evidence,'" instead of "review[ing] a legislature's empirical judgment *de novo*." *King*, 767 F.3d at 238 (quoting *Turner*, 520 U.S. at 195). Here, Grewal has established the risk of *quid pro quo* corruption and its appearance is real.

First, Grewal presents several historical incidents of *quid pro quo* corruption or its appearance by banks that occurred a few years before N.J. Stat. Ann. § 19:34-45 was enacted. NJBA does not dispute the veracity of these historical facts. (ECF No. 92 at 21 n.7.) For example, President Roosevelt was accused of stopping an investigation into trusts affiliated with J.P. Morgan, after J.P. Morgan contributed $150,000 to his 1904 reelection campaign. (ECF No. 81-1 at 12). Later, in the Armstrong Committee hearings of 1905, a number of financial institutions admitted having funneled campaign contributions to national political parties, including a check for $48,000 that J.P. Morgan contributed to President Roosevelt's campaign.

(*Id*. at 13.) Senator T. C. Platt, a then Republican Party leader, acknowledged these contributions had been made for the past 15 years, and referred to a "moral obligation" of political candidates not to attack the interests of their sources of campaign contribution. (*Id*.) Such large contributions by a bank to a political party could lead to actual *quid pro quo* corruption or its appearance. *See McConnell*, 540 U.S. at 144 ("The idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible."); *Nixon*, 528 U.S. at 395 ("[T]here is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters."). These historical incidents occurred at the national level, making the risk of *quid pro quo* corruption and its appearance more than conjectural in New Jersey at the time N.J. Stat. Ann. § 19:34-45 was enacted. Whether or not the New Jersey legislature actually considered these incidents in the legislative process is inessential. *Phillips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997) (requiring "that there be a factual basis for a legislative judgment presented in court when that judgment [wa]s challenged," but not "that such a factual basis ha[d] been submitted to the legislative body prior to the enactment of the legislative measure").

Second, Grewal provides modern day incidents of *quid pro quo* corruption or its appearance in New Jersey's banking sector. NJBA does not dispute the veracity of these incidents. (*See* ECF No. 92 at 23.) For example, in 1995, a New Jersey state official pleaded guilty for accepting a $240,000 kickback in exchange for steering a municipal bond underwriting contract to First Fidelity Bank. (ECF No. 81-1 at 22.) In addition, the SEC investigated political contributions made to Democratic Party officials by the underwriters of $224 million in bonds sold in 1992 by the New Jersey Sports & Exposition Authority. (*Id*.) Even if these incidents did

not result in a conviction or an actual *quid pro quo* transaction, they could create an appearance of *quid pro quo* corruption. *See Ognibene*, 671 F.3d at 187 (finding that "indicators of [*quid pro quo*] corruption or its appearance" occurred, "when donors ma[d]e large contributions because they ha[d] business with the [c]ity, hope[d] to do business with the [c]ity, or [we]re expending money on behalf of others who do business with the [c]ity"). Moreover, these modern day incidents are actual cases of legal enforcement, which represent a more than conjectural harm of corruption. *C.f. Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Phila.*, 763 F.3d 358, 373 (3d Cir. 2014) (finding that the "evidence of recent politically-orchestrated harm [wa]s non-existent," when the "only showing of present-day police corruption consist[ed] of articles about 'dirty cops' and corrupt politicians"). Also, judicial deference is warranted "when reviewing longstanding restrictions," because "when regulation has succeeded, it is often difficult to discover evidence that the targeted abuses continue to exist." *Id.* (finding that the government established a real risk of *quid pro quo* corruption or its appearance, though the historical "systemic corruption that led to the [contribution] ban" on police officers was no longer existent). N.J. Stat. Ann. § 19:34-45 "warrants such judicial caution: it addressed real harms at the time of its enactment, was the product of decades of legislative adjustment, and has remained unchanged for more than six decades." *Id.* at 374.

Therefore, the Court finds Grewal has drawn reasonable inferences based on substantial evidence of past and recent incidents of *quid pro quo* corruption or its appearance, and has shown a real risk of *quid pro quo* corruption in New Jersey's banking sector. Grewal has adequately asserted a legitimate governmental interest underlying N.J. Stat. Ann. § 19:34-45.

## 2.  N.J. Stat. Ann. § 19:34-45 Is Closely Drawn to Match the Asserted Governmental Interest

Grewal suggests the Court should exercise restraint when asked to overturn a legislature's century-old judgment that a law is needed to prevent *quid pro quo* corruption or its appearance. (ECF No. 81-1 at 39.) Grewal insists N.J. Stat. Ann. § 19:34-45 is not poorly tailored for being either overinclusive or underinclusive. (*Id*. at 40.) Grewal maintains NJBA's argument that N.J. Stat. Ann. § 19:34-45 is overinclusive is foreclosed by *Beaumont*, which upheld an even broader contribution prohibition than N.J. Stat. Ann. § 19:34-45. (*Id*. at 41 (citing *Beaumont*, 539 U.S. 146).) Grewal indicates N.J. Stat. Ann. § 19:34-45 still allows ample political participation by banks through PACs and contributions by their individual employees. (*Id*. at 43.) Grewal contends the less restrictive alternatives proposed by NJBA are ineffective in serving New Jersey's anticorruption interest: (1) the history of wheeling[5] and small-dollar bribes suggests contribution limits are insufficient to prevent *quid pro quo* corruption and its appearance; (2) the disclosure requirements are less effective and more difficult in preventing wheeling, because enforcing them would call for comprehensive financial analysis to detect large contributions made through multiple transactions; (3) pay-to-play laws that only prevent entities from making contributions to obtain a state contract do not prohibit banks from reaping other improper benefits, such as a favorable legislation or regulatory action, and would make it more difficult to detect contractors' contributions made through their subsidiaries, affiliates, employees, or shareholders; (4) a prohibition that targets only elected officials who directly regulate banks would open the door for corrupt contributions made to state legislators for obtaining regulatory changes, to state officials for obtaining public contracts, and to state party committees or officials

---

[5] Wheeling uses intermediaries to shield the original donor's identity, thereby enabling that donor to evade contribution limits. (ECF No. 83 at 34.)

who could channel the contributions to the Governor. (ECF No. 83 at 34–37.) Grewal states N.J. Stat. Ann. § 19:34-45 should cover (1) banks with no regulatory relationships to New Jersey and (2) elections having no nexus to banking regulation, in light of recent examples of financial *quid pro quo* without involving such relationships or nexuses. (ECF No. 81-1 at 44.) Grewal claims N.J. Stat. Ann. § 19:34-45 is not overbroad for being more restrictive than certain other states' laws, when fifteen other states prohibit all corporate contributions, and three specifically prohibit contributions by banks. (*Id*. at 44 n.9.) Grewal stresses legislatures may tailor contribution restrictions to the political realities in their respective states. (ECF No. 83 at 41.) Finally, Grewal argues, in the First Amendment context, a state law cannot be invalidated for being underinclusive, because a state need not address all aspects of a problem in one fell swoop. (ECF No. 81-1 at 45.) Grewal explains underinclusiveness is not a legal defect on its own, and can only raise doubts about whether the government is in fact pursuing the interest it invokes. (*Id*. at 46.) Grewal claims N.J. Stat. Ann. § 19:34-45 is not underinclusive, because it targets not only banks, but also a whole range of industries where concerns for *quid pro quo* corruption or its appearance are most acute. (*Id*.)

NJBA argues N.J. Stat. Ann. § 19:34-45 is more restrictive than necessary, because it is a complete contribution ban, which deprives banks of any form of contribution, including small contributions and contributions to PACs. (ECF No. 82-1 at 42–43, 49 (citing *McCutcheon*, 572 U.S. at 210; *Deon v. Barasch*, 960 F.3d 152, 159 (3d Cir. 2020)).) NJBA alleges N.J. Stat. Ann. § 19:34-45 was enacted to curtail corporate influence over government officials (*id*. at 43) and, because neither the Attorney General nor the Supreme Court mentioned *quid pro quo* corruption by banks in their expositions of N.J. Stat. Ann. § 19:34-45 and the Tillman Act, N.J. Stat. Ann. § 19:34-45 is a not fitting response to New Jersey's corruption problem (ECF No. 92 at 23). NJBA

contends Grewal fails to provide detailed and sufficient evidence of *quid pro quo* corruption by banks that can be addressed by N.J. Stat. Ann. § 19:34-45. (ECF No. 82-1 at 43; ECF No. 92 at 24 (citing *Lodge*, 763 F.3d 358).) NJBA maintains N.J. Stat. Ann. § 19:34-45 is overbroad in comparison with other states' election laws, because 31 states currently allow banks to make campaign contributions in some form, including three states that once had bans similar to New Jersey's and later abandoned them, and no other state singles out banks on campaign contribution bans. (ECF No. 82-1 at 44.) NJBA considers the Reporting Act, which only imposes contribution limits and disclosure requirements on state contractors, represents a less restrictive alternative to N.J. Stat. Ann. § 19:34-45. (*Id*. at 45–46.) NJBA suggests N.J. Stat. Ann. § 19:34-45 could be more targeted by limiting its ban to contributions made to officials who (1) directly regulate banks, (2) may provide banks with business opportunities, or (3) are responsible for selecting the New Jersey Department of Banking and Insurance commissioners (*i.e.*, the Governor). (*Id*. at 47–48.) As for small-dollar bribes and wheeling, NJBA argues (1) Grewal has not shown those practices are an issue in New Jersey's banking sector (ECF No. 92 at 27), (2) disclosure is a less restrictive alternative to address the wheeling problem (ECF No. 82-1 at 48), and (3) small-dollar bribes could not justify the breadth of N.J. Stat. Ann. § 19:34-45, because they do not give rise to the risk of corruption (*id*. (citing *McCutcheon*, 572 U.S. at 210)). NJBA contends Grewal cannot rely on *Beaumont*, because it (1) conflicts *Citizens United* and *McCutcheon* on the view of corruption associated with corporations, (2) involves a corporate contribution ban, which differs from a regulated industry ban like N.J. Stat. Ann. § 19:34-45, and (3) upholds a contribution prohibition that allows corporations to contribute to PACs, and does not cover individual majority owners or stockholders of banks, trade associations representing

banks, and subsidiaries of banks, but N.J. Stat. Ann. § 19:34-45 does not permit these options. (*Id*. at 48–49; ECF No. 92 at 28–31.)

CLC maintains *Beaumont* forecloses NJBA's challenge to N.J. Stat. Ann. § 19:34-45, which is a similar but narrower statute compared to that upheld in *Beaumont*. (ECF No. 91 at 14–15 (citing *Beaumont*, 539 U.S. 146).) CLC argues *Citizens United*, which only addressed the constitutionality of corporate expenditure restrictions, could not disturb *Beaumont*'s holding. (*Id*. (citing *Citizens United*, 558 U.S. 310).) CLC claims federal circuit courts have recognized *Beaumont*'s continuing authority in repeatedly rejecting challenges to federal and state laws prohibiting corporate contributions, including restrictions substantially broader than N.J. Stat. Ann. § 19:34-45. (*Id*. at 15.) CLC cites a number of cases upholding more targeted contribution restrictions as constitutional means of reducing actual and apparent corruption by highly regulated entities, such as contractors, lobbyists, licensees, and the financial services industry. (*Id*. at 16–17.) CLC explains *McCutcheon* and *Deon* are inapplicable here: the *McCutcheon* court invalidated an aggregate cap on total contributions to all federal candidates layered on top of existing base limits, but did not question the constitutionality of contribution restrictions generally or alter the relevant analytical framework; the *Deon* court invalidated a Pennsylvania contribution ban targeting gaming licensees, because the ban was nearly identical to a restriction previously invalidated by Pennsylvania's state supreme court. (*Id*. at 19–20 (citing *McCutcheon*, 572 U.S. at 200; *Deon*, 960 F.3d at 155).) CLC contends the evidence of recent q*uid pro quo* corruption is unlikely and unnecessary where, as here, contribution restrictions have been in place for a long time. (*Id*. at 20.)

The Court finds N.J. Stat. Ann. § 19:34-45 is closely drawn to its underlying governmental interest.

### a. N.J. Stat. Ann. § 19:34-45 Is Not Overinclusive

Under the intermediate scrutiny standard, "the law need not be the least restrictive means available," and the inquiry is "whether the government has made its case that the scope of the provision is 'in proportion to the interest served.'" *Deon*, 960 F.3d at 161 (citing *McCutcheon*, 572 U.S. at 218). "[C]ontribution limitations are permissible as long as the [g]overnment demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (quoting *Buckley*, 424 U.S. at 25). What is required is "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition." *Deon*, 960 F.3d at 161 n.48 (citing *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989)). In addition, judicial deference to legislative choice is particularly warranted when reviewing restrictions on campaign contributions, which carry "a plain threat to political integrity." *Beaumont*, 539 U.S. at 155. Judicial deference is also required "when reviewing longstanding restrictions," because "when regulation has succeeded, it is often difficult to discover evidence that the targeted abuses continue to exist." *Lodge*, 763 F.3d at 373 (citations omitted). Since N.J. Stat. Ann. § 19:34-45 is a restriction on political contribution enacted in 1911, its review warrants judicial deference, with which the Court finds it is not overinclusive.

First, N.J. Stat. Ann. § 19:34-45, as declared in Part III.A, *supra*, does not prohibit banks from making independent expenditures, including contributions to PACs. This means any burden on the First Amendment rights imposed by the statute is limited. *See Wagner v. FEC*, 854 F. Supp. 2d 83, 93 (D.D.C. 2012) (citations omitted) ("There is even less need for the [c]ourt to interfere with legislative judgments where the persons affected by the ban have other meaningful avenues for political association and expression."); *Yamada*, 872 F. Supp. 2d at 1060 ("Any

burden on [the government contractor] caused by the contribution ban is lessened because [the contractor's] officers or employees . . . may themselves make contributions."). As a result, N.J. Stat. Ann. § 19:34-45 is not unconstitutional *per se*, even if it is a total ban on contributions. *See Beaumont*, 539 U.S. at 154, 162–63 (upholding 2 U.S.C. § 441b's "complete ban" on corporate contributions as constitutional and narrowly tailored to serve the public interest of "prevent[ing] corruption or the appearance of corruption," because it "permit[ted] some participation of unions and corporations in the federal electoral process by allowing them to establish and pay the administrative expenses of PACs");[6] *see also Preston v. Leake*, 660 F.3d 726, 736 (4th Cir. 2011) (upholding a contribution ban "designed to prohibit only contributions having monetary value and then only when made by a lobbyist to a candidate," when "[t]he lobbyist [wa]s left free to pursue any other First Amendment activity to express actual or symbolic support of a candidate"); *c.f. Lodge*, 763 F.3d. at 384 (invalidating a contribution ban which was not "closely drawn" to the anticorruption interest, when "[t]he ban prevent[ed] police officers from donating to a political action committee unaffiliated with any political candidate").

Second, N.J. Stat. Ann. § 19:34-45 may justifiably target its ban on the banking industry. The Supreme Court's support of "longstanding federal 'ban on direct corporate contributions' . . . . is enough to demonstrate that laws banning contributions by a discrete group are not unconstitutional *per se.*" *Green Party of Conn. v. Garfield*, 616 F.3d 189, 204 (2d Cir. 2010) (quoting *Beaumont*, 539 U.S. at 154). An industry-specific contribution ban is justified when that industry by its nature is susceptible to corruption. *Preston*, 660 F.3d at 727 (finding that lobbying "by its very nature" was "prone to corruption and therefore especially susceptible to public suspicion of corruption," and, "in aiming the ban at only lobbyists, who, experience ha[d] taught,

---

[6] NJBA "acknowledges that *Beaumont* has not been overruled." (ECF No. 92 at 30.)

[we]re especially susceptible to political corruption, North Carolina closely drew its enactment to serve the state interests it identified"). Recent corruption scandals need not be shown in such an industry. *Schickel*, 925 F.3d at 873–74 (upholding a total ban on contributions by lobbyists, whose "role undoubtedly sharpen[ed] the risk of corruption and its appearance," without "require[ing] a recent scandal"). Therefore, N.J. Stat. Ann. § 19:34-45 may constitutionally target its ban on the banking industry, where "no smoking gun is needed," because "the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Blount*, 61 F.3d at 944–45 (finding that "underwriters' campaign contributions self-evidently create[d] a conflict of interest in state and local officials who ha[d] power over municipal securities contracts and a risk that they w[ould] award the contracts on the basis of benefit to their campaign chests rather than to the governmental entity," even though "the record contain[ed] no evidence of specific instances of quid pro quos").

The corruption scandals in the banking industry that occurred nationally before the enactment of N.J. Stat. Ann. § 19:34-45 and recently in New Jersey, as discussed in Part III.B.1.b, *supra*, provide further justification for N.J. Stat. Ann. § 19:34-45. *See Wagner*, 854 F. Supp. 2d at 91 (upholding a contribution ban on federal contractors, because "[w]hen Congress first enacted the ban on political contributions by federal contractors, it was responding to a recent history of corruption"); *Preston*, 660 F.3d at 736 (concluding that the North Carolina legislature, in response to recent corruption scandals of lobbyists, "made the rational judgment that a complete ban [on contributions by lobbyists] was necessary as a prophylactic to prevent not only actual corruption but also the appearance of corruption in future state political campaigns"); *Green Party*, 616 F.3d at 206–07 (upholding an outright "ban on contractor contributions because the recent corruption scandals in Connecticut [] created an appearance of

corruption with respect to all exchanges of money between state contractors and candidates for state office," which rendered the ban "closely drawn to meet the state's anticorruption interest," while invalidating a "ban on lobbyist contributions" because "[t]he recent corruption scandals had nothing to do with lobbyists"); *c.f. Deon*, 960 F.3d at 164 (invalidating a contribution ban on gaming industry-related persons in Pennsylvania, because the government failed to provide any evidence of corruption in the gaming industry in "the real world that Pennsylvania face[d]" and therefore fell "well short of its burden to show [the ban] [wa]s closely drawn"). Even an absence of recent examples of *quid pro quo* corruption "does not necessarily mean, however, that the ban is no longer needed," because "[i]t could simply be an indication that the ban is working." *Wagner*, 854 F. Supp. 2d at 91 (citing *Burson v. Freeman*, 504 U.S. 191, 208 (1992)); *see also Schickel v. Dilger*, 925 F.3d 858, 874 (6th Cir. 2019) (citing *Citizens United*, 558 U.S. at 356) (rejecting the argument that "only recent scandals" could "justify a contribution ban," because legitimate "contribution limits" could be "preventative measures").

Third, N.J. Stat. Ann. § 19:34-45 is not an outlier compared to other states' restrictions on political contribution. The statute imposes contribution ban on banks, as well as "insurance, railroad, street railway, telephone, telegraph, gas, electric light, heat or power, canal or aqueduct company." N.J. Stat. Ann. § 19:34-45. Grewal alleges fifteen other states currently prohibit all corporations from making campaign contributions, and three other states bar contributions from certain specific industries which include the banking industry. (ECF No. 81-1 at 37–38.) NJBA does not dispute Grewal's allegation. (*See* ECF No. 82-1 at 44.) In other words, apart from New Jersey, eighteen other states currently adopt a contribution ban with a scope similar to or wider than N.J. Stat. Ann. § 19:34-45. Therefore, N.J. Stat. Ann. § 19:34-45 is not an outlier. *See Wagner v. FEC*, 793 F.3d 1, 16 (D.C. Cir. 2015) (concluding that, because "[a]t least seventeen

states" imposed similar restrictions on contributions from "state contractors or licensees," the challenged "federal statute [wa]s no outlier"); *c.f. Deon*, 960 F.3d at 163–64 (invalidating a ban on political contributions from Pennsylvania's gaming industry, because "the nature of gaming-industry-related corruption [did not] create[] a 'common sense' need" for such a ban, when only two other states "implemented a ban of comparable scope to Pennsylvania" among "the twenty-five states with legalized casino gambling").

Fourth, the Court need not consider what NJBA proposes as less restrictive alternatives to N.J. Stat. Ann. § 19:34-45, because N.J. Stat. Ann. § 19:34-45's total ban is justified and represents a legislative choice entitled to judicial deference. Moreover, the Court finds these proposals are inadequate in addressing *quid pro quo* corruption and its appearance, and therefore do not undermine the fitness of N.J. Stat. Ann. § 19:34-45 to its underlying governmental interest. *McCullen v. Coakley*, 573 U.S. 464, 496 (2014) (concluding that, under the intermediate scrutiny standard, a restriction on speech was "justified" when "less restrictive measures were inadequate").

Merely a limit on contribution cannot prevent small contributions, which may lead to an appearance of *quid pro quo* corruption. *See Wagner*, 854 F. Supp. 2d at 24 ("[C]orrupt and coercive patronage regimes can take root even when relatively small amounts of money are at stake."); *Preston*, 660 F.3d at 740 ("The small campaign contribution, just as the small gift, suffers from a legitimate suspicion of corruption, which North Carolina reasonably sought to eliminate, particularly in light of North Carolina's prior scandals."); *Yamada*, 872 F. Supp. 2d at 1062 ("[A] complete ban on contractor contributions—as opposed to a mere limit on the amount or a restriction on the type of contract—is also closely tailored . . . to alleviate a perception of government contractors receiving benefits for dollars."); *Green Party*, 616 F.3d at 206 ("[E]ven a

severe limit on contractor contributions would allow a small flow of contributions between contractors and candidates and would, as a result, likely give rise to an appearance of corruption.").

Disclosure requirements alone may not effectively prevent banks from circumventing a ban or limitation on contribution. New Jersey has a legitimate interest in preventing circumvention of its restrictions on contributions, which derives from its interest in addressing *quid pro quo* corruption and its appearance. *McCutcheon*, 572 U.S. at 220–21 (recognizing "the [g]overnment's anticircumvention interest" in implementing its limitations on contribution); *McConnell*, 540 U.S. at 304 ("Any anticircumvention interest can be only as compelling as the interest justifying the underlying regulation."); *see also Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 444 (5th Cir. 2014) ("Texas has an anticircumvention interest in preventing corporations from evading its ban on corporate contributions."); *Ognibene*, 671 F.3d at 197 n.1 (discussing "the state's 'anticircumvention' interest" as "largely derivative of the state's 'anticorruption' interest"). Here, Grewal refers to actual instances of wheeling in New Jersey politics, which could obscure the identity of the actual donor, thereby rendering any disclosure requirement less effective. (ECF No. 81-1 at 20.) Though these wheeling instances did not involve banks, there is a real risk of wheeling in the banking industry, because (1) the industry has a natural susceptibility to corruption and a record of corruption scandals, and (2) there are practical ways of circumvention not foreclosed by disclosure requirements. *See McCutcheon*, 572 U.S. at 224 (citations omitted) ("Because individuals' direct contributions are limited, would-be donors may turn to other avenues for political speech. Individuals can, for example, contribute unlimited amounts to 501(c) organizations, which are not required to publicly disclose their donors."); *see also Catholic Leadership Coal.*, 764 F.3d at 444–45

(finding that corporations could evade a "ban on corporate contributions to candidates through corporate contributions to a general-purpose committee that (1) engages in independent expenditures and corporate contributions and (2) lacks sufficient internal controls to safeguard against the risk that the corporate contributions, even if formally earmarked for independent expenditures, could be funneled to a candidate"). Therefore, N.J. Stat. Ann. § 19:34-45's total ban, which covers indirect contributions made via a conduit, is a reasonable fit to its anticorruption objective and represents a judicial judgment that warrants judicial deference. *See Ala. Democratic Conf. v. AG*, 838 F.3d 1057, 1070 (11th Cir. 2016) (upholding "the PAC-to-PAC transfer ban" as constitutional, so that "contributions to the [political organization] can no longer pass through PACs in a way that could obscure the true source of the funds"); *Dilger*, 176 F. Supp. 3d at 700 (citing *Beaumont*, 539 U.S. at 154, 156–57) ("[E]ven if less restrictive alternatives such as disclosure requirements exist, the [c]ourt must give certain deference to the legislature's choice in regulating political involvement unless the legislature's action clearly violates federal constitutional requirements."); *Lair v. Murry*, 871 F. Supp. 2d 1058, 1070 (D. Mont. 2012) (citing *Beaumont*, 539 U.S. at 160; *Buckley*, 424 U.S. at 23 n.24) ("[A] state may [] prevent a corporation from making an indirect contribution to a candidate or political party through the use of a conduit—e.g., contributing money to a political committee that then contributes that money to a candidate or political party.").

A ban that only (1) prohibits contributions made to officials who directly regulate or deal with banks, and (2) applies to entities from making contributions to obtain a government contract, would open the door for direct contributions made to state legislators, thereby creating *quid pro quo* corruption or its appearance. *See Schickel*, 925 F.3d at 874 (citing *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 716 (4th Cir. 1999)) ("[C]ontributions to a legislator (or his

challenger) when a legislator is poised to cast a favorable (or unfavorable) vote on a pet bill could cause [the public] to question whether the contribution motivated the vote."); *Maupin*, 922 F. Supp. at 1420 ("[A]lthough not every contribution given to an incumbent candidate is intended for a corrupting *quid pro quo* arrangement, acceptance of contributions while the legislature is in regular session promotes the appearance of corruption.")

If the ban does not cover (1) banks with no regulatory relationships to New Jersey or (2) elections having no nexus to banking regulations, it would allow these non-covered banks to make direct contributions to state officials to obtain government contracts, which leads to *quid pro quo* corruption or its appearance. *See Deon v. Barasch*, 341 F. Supp. 3d 438, 444 (M.D. Pa. 2018), *aff'd*, 960 F.3d 152 (3d Cir. 2020) (citing *Wagner*, 793 F.3d at 22) ("Indeed, if there is an area that can be described as the 'heartland' of *quid pro quo* corruption concerns, the contracting process is it."); *Yamada v. Snipes*, 786 F.3d 1182, 1206 (9th Cir. 2015) (citations omitted) ("[D]irect contributions from contractors to officeholders and candidates [are] the contributions most closely linked to actual and perceived *quid pro quo* corruption.").

Accordingly, the Court does not find N.J. Stat. Ann. § 19:34-45 overinclusive.

### b. N.J. Stat. Ann. § 19:34-45 Is Not Underinclusive

A "statute is not invalid under the Constitution because it might have gone farther than it did." *Buckley*, 424 U.S. at 105 (citing *Roschen v. Ward*, 279 U.S. 337, 339 (1929)); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) ("[T]he First Amendment imposes no freestanding 'underinclusiveness limitation.' A State need not address all aspects of a problem in one fell swoop."). "[A] rule is struck for underinclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest, because it provides only ineffective or remote support for the asserted goals, or limited incremental support." *Blount*, 61 F.3d at 944–45

(citations omitted). "Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." *Williams-Yulee*, 575 U.S. at 450 (citing *Fla. Star v. B. J. F.*, 491 U.S. 524, 540 (1989)); *c.f. Lodge*, 763 F.3d at 381 (finding a contribution ban underinclusive, because it "permit[ed] the police union (a group perceived to be the collective voice of the police) to engage in such expressive activities, while it preclude[d] individual police officers (whose involvement [wa]s not necessarily representative) from doing the same," thereby "fail[ing] to regulate a substantial part of the activity that g[ave] rise to the alleged harms"). Here, N.J. Stat. Ann. § 19:34-45, as a total ban on political contributions from certain industries, is able to provide some effective support to address the problem of *quid pro quo* corruption or its appearance. Also, the Court does not discern, and NJBA does not argue, the State of New Jersey regulates one aspect of the problem via the statute while ignoring another. Therefore, N.J. Stat. Ann. § 19:34-45 is not underinclusive.

Accordingly, N.J. Stat. Ann. § 19:34-45's ban on political contributions is closely drawn to the governmental interest in addressing *quid pro quo* corruption or its appearance, and does not violate the First Amendment. As to Count II, Grewal's Motion for Summary Judgment is **GRANTED** and NJBA's Cross Motion for Summary Judgment is **DENIED**.

## IV.   CONCLUSION

For the reasons set forth above, Grewal's Motion for Summary Judgment is **GRANTED in part and DENIED in part**, and NJBA's Cross Motion for Summary Judgment is **GRANTED in part and DENIED in part**. Grewal's Motion for Summary Judgment is **DENIED** as to Count I and **GRANTED** as to Count II. NJBA's Cross Motion for Summary Judgment is **GRANTED** as to Count I and **DENIED** as to Count II. The Court declares N.J.

Stat. Ann. § 19:34-45 does not ban any entity from making independent expenditures. An appropriate order follows.

**Date: June 21, 2021**                    */s/ Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**